1       IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3    SAUL M. KAUFMAN, et al.,          )

4                   Plaintiffs,        )

5            -vs-                      )   No. 07 C 1707

6    AMERICAN EXPRESS TRAVEL           )
     RELATED SERVICES CO.,             )   Chicago, Illinois
7                                      )   December 20, 2012
                    Defendant.         )   9:15 a.m.
8
                    TRANSCRIPT OF PROCEEDINGS
9          BEFORE THE HONORABLE JOAN B. GOTTSCHALL

10   APPEARANCES:

11   For the Plaintiff:      BOCK & HATCH
                             134 North LaSalle Street
12                           Chicago, Illinois  60602
                             BY:  MR. RICHARD JOSEPH DOHERTY
13
     For Intervenors
14   Goodman & Santsche:     GREENFIELD & GOODMAN LLC
     (Via telephone)         250 Hudson Street, 8th Floor
15                           New York, New York  10013
                             BY:  MR. RICHARD D. GREENFIELD
16
     For the Defendant:      HINSHAW & CULBERTSON
17                           222 North LaSalle Street, Suite 300
                             Chicago, Illinois  60601
18                           BY:  MR. DANIEL KEENAN RYAN

19                           STROOCK & STROOCK & LAVAN LLP
                             2029 Century Park East
20                           Los Angeles, California  90067
                             BY:  MR. JAMES L. BERNARD
21                                MS. MONICA HANNA

22
                  COLETTE M. KUEMMETH, CSR, RMR, FCRR
23                    OFFICIAL COURT REPORTER
              219 South Dearborn Street, Room 2328A
24                   Chicago, Illinois  60604
                        (312) 554-8931
25

1   APPEARANCES:   (Continued)

2   ALSO PRESENT:                    MR. TODD B. HILSEE
                                        The Hilsee Group LLC

3                                         121 N. Main Street, Suite 302
                                        P.O. Box 64151

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings heard in open court:)

2         THE CLERK:  2007 C 1707, Kaufman versus American

3    Express.

4         MR. DOHERTY:  Good morning, your Honor.  Richard

5    Doherty on behalf of the plaintiffs.

6         THE COURT:  Good morning.

7         MR. RYAN:  Dan Ryan for defendant American Express,

8    your Honor.

9         MR. BERNARD:  Good morning, your Honor.  James

10   Bernard, also on behalf of defendant American Express, and

11   with me is my colleague, Monica Hanna.

12        THE CLERK:  Mr. Greenfield?

13        MR. GREENFIELD:  Yes.

14        THE CLERK:  Please state your name for the record.

15        MR. GREENFIELD:  Richard D. Greenfield, on behalf

16   of Intervenors Goodman and Santsche.

17        THE CLERK:  Mr. Hilsee, please state your name for

18   the record.

19        MR. HILSEE:  Todd B. Hilsee of the Hilsee Group

20   LLC.

21        THE COURT:  Good morning.  I think what we were

22   going to do is go over Mr. Hilsee's recommendations, whatever

23   issues there were with those recommendations, and try to come

24   up with a plan.  Is that right?

25        MR. BERNARD:  It is, your Honor, yes.  And if I can

1  maybe start with a proposal, with a plan.

2        THE COURT:  Sure.

3        MR. BERNARD:  Because I think what we've tried to

4  do is tape together some various bits and pieces of the

5  various ideas and come up with three proposals of the next

6  steps.

7        THE COURT:  Okay.

8        MR. BERNARD:  The first is that after your Honor's

9  order in the last conference, we went back and checked the

10  records to determine what e-mail addresses were available.

11  We have 460,000 e-mail addresses, give or take.

12        THE COURT:  How many did we think we had

13  originally?

14        MR. BERNARD:  I don't know how many.  I actually

15  did not have a view as to how many we had originally.  I saw

16  that my colleague at the last conference before your Honor

17  wasn't sure how many there were.  I didn't think there were

18  many, but actually it turns out I think 460,000 is

19  substantial.

20        THE COURT:  Right.

21        MR. BERNARD:  After the last conference, the next

22  part of the proposal, your Honor, is your Honor asked us to

23  go back and look for records of complaints and to find out

24  what the record trail was on the number of complaints.  We

25  had 2,100 complaints, of which there are 250 with e-mail

1  addresses as well.  So --

2           THE COURT:  Are those included in the 460,000 or

3  not?

4           MR. BERNARD:  Additional.

5           THE COURT:  They're additional.  Okay.

6           MR. BERNARD:  Yes.  So what we propose with respect

7  to that portion of a plan, your Honor, if you will, is let's

8  send out e-mail notices to all 400 something thousand folks.

9  We can work with Mr. Hilsee on the form and the content of

10  that e-mail notice.

11          We agree with his proposal to link it automatically

12  to the website in some way, that's a good idea, we should do

13  it, and let's come up with a form of an e-mail, as Mr. Hilsee

14  said, that's most likely not to get caught in a spam filter.

15  Because that's a big concern.

16          THE COURT:  Right.

17          MR. BERNARD:  So we'll do that.  What we'll also

18  do, Judge, because we have 2,100 complaints, of which only

19  250 have e-mail addresses, is send some form of paper notice.

20  And again, we'll work with Mr. Hilsee, we'll work with the

21  plaintiffs to come up with a paper notice to all those 2,100

22  folks.  So we won't cut out the 250 that we're sending

23  e-mail, there are 250 that will receive both e-mail and

24  paper.

25          THE COURT:  And there is going to be a link on the

1    AmEx site; you said you thought it was a good idea.  What

2    exactly did you think was a good idea?

3              MR. BERNARD:  To have a link in the e-mail that

4    goes out to the settlement administration website.  So if I'm

5    an e-mail recipient of this notice, and I say yes, I want to

6    file a claim, you click on a link, and it goes to the

7    settlement administrator's website, and you can fill out

8    whatever forms you need to fill out right there.

9              THE COURT:  Okay.

10             MR. BERNARD:  The third part of our proposal really

11   deals with this issue that we have all been struggling with

12   of the anonymous side of the class.  So we covered the

13   specific individuals identified in the way I just mentioned,

14   and then the anonymous side.  So what are we going to do

15   there?

16             There what we came up with was a plan to submit

17   some additional advertisements in some 10 or 11 or so

18   publications where we thought we could increase the reach,

19   roughly some 50 percent based on the demographic and other

20   information, some of which Mr. Hilsee had actually in his

21   initial report.  And we could do that, Judge, most

22   importantly, within the budget or within the kind of

23   reasonable range of what it might cost.

24             The notice publication that we're thinking of in

25   these various magazines, about $500,000.  And just to give

1  your Honor a sense of where we are in the case financially --

2  THE COURT:  Yes.

3  MR. BERNARD:  -- we've got about $4 million left in

4  the settlement fund.  3,900,000.  So any proposal that we

5  come up with really needs to take into account what money is

6  there, and the piece that I don't have for your Honor yet,

7  because it in part depends on what we decide here today, is

8  how much is it going to cost to do the e-mail, the 400

9  something thousand e-mail notices, and how much is it going

10  to cost to do the additional 2,000 notices.

11  THE COURT:  The publications that you're speaking

12  of, that's $500,000 for all of them?

13  MR. BERNARD:  Yes.

14  THE COURT:  What kind of publications are you

15  thinking of?

16  MR. BERNARD:  I'll read them out.

17  THE COURT:  Okay.

18  MR. BERNARD:  And then I have one variation on

19  that, because Mr. Hilsee raised the concern in the latest

20  submission that I want to address in case the Court thinks

21  it's helpful.  We've got People, we've got Better Homes and

22  Gardens, we've got National Geographic, we've got Woman's

23  Day, we've got Parents, we've got Family Circle.  Those were

24  some of the magazines in Mr. Hilsee's initial letter, and

25  then we added four more:  Martha Stewart Living, Esquire,

1  AARP, and Southern Living.

2            And the total -- and this is where we get into an

3  issue that we can address with the Court -- for

4  one-third-page ads in those publications would be about

5  500,000.  And that's using the rate information that we have

6  right now.  I don't know if it changes.

7            Mr. Hilsee raised the concern about whether or not

8  a third-page ad would really be sufficient.  Is it going to

9  be big enough.  We happen to think that that's standard

10  industry practice, that people use a third-page ad in these

11  notices, but if that is a concern to the Court, one option

12  that we come up with is to go to half-page ads, full

13  half-page, and reduce the number of publications that we do

14  this in.  And we've come up with a way, Judge, that rather

15  than doing these 10 or 11, we could do six at half-page

16  rather than 10 or 11 at a third-page for about the same cost.

17            So that's another option, depending on whether we

18  want to do more publications, less space -- excuse me, more

19  space, or more publications with less space.  We can kind of

20  play around with that.

21            Those are our three proposals, Judge, to try and

22  bring some closure to this, move it forward, and I think what

23  we've tried to do here is address both the individual notice

24  where we have it and publication notice where we can do that

25  for the anonymous part of the class.

1    THE COURT:  Just a question on this selection of

2    publications.  I have no idea, but it sounds to me as if a

3    lot of them, like Better Homes and Gardens, and Woman's Day,

4    and Parents, wouldn't those all catch the same people?

5    MR. BERNARD:  Mr. Hilsee actually raised that at

6    one point as well, so that there might be some overlap with

7    respect to this.  And I think that's certainly true.  I can't

8    deny that.  I was trying to get, I guess, as many different

9    publications, frankly, where I thought people who were

10   interested in gifts might go to look to figure out what to

11   buy for a gift.

12   And then the other rationale that we used in trying

13   to come up with these, for example Southern Living, was to

14   try and make sure we targeted a specific population in the

15   country that we might not be reaching by the other ones.

16   Judge, there is no science to this.  I'm of course

17   open to ideas.  If people want to replace one publication

18   with another, or take one out, those are the kinds of

19   discussions that I think are completely productive.

20   THE COURT:  I can't even imagine, I don't know, I

21   don't know enough about who reads what, but it seems to me

22   that one problem, just from my very informal anecdotal

23   experience with this, is that there ought to be something, if

24   we're going to do publications, that is targeted at an urban,

25   I would think minority audience.  I mean, Southern Living is

1    great, but as far as I know, the bigger concern might be

2    people who go into drugstores to buy gifts.

3                MR. BERNARD:  Fair enough.

4                THE COURT:  And I don't think that's the Southern

5    Living group.

6                MR. BERNARD:  Fair enough, Judge.  And I think

7    that's the kind of discussion that we can take back those

8    ideas, we go back to the drawing board.  Easy enough, your

9    Honor, to re-juggle this list a little bit and come up with

10   some other ideas and submit a letter to the Court, and say

11   Judge, we've rethought it through, here's a revised list.

12               THE COURT:  Let's talk for a minute about what

13   we're not doing.  We're not doing, by your proposal, any kind

14   of re-mailing except to the complaint group, right?

15               MR. BERNARD:  That's correct, Judge.

16               THE COURT:  We're not putting any kind of a link on

17   the AmEx site.

18               MR. BERNARD:  That's correct, Judge.

19               THE COURT:  Let's see what else.

20               Mr. Hilsee, I'm looking for your first report for

21   your other suggestions.

22               MR. HILSEE:  Your Honor, can you hear me?

23               THE COURT:  Yes, but not very well.

24               MR. HILSEE:  Hello?

25               THE COURT:  Yes, I can hear you.

1       MR. HILSEE:  Okay.  I apologize very much for not

2   being able to be there today due to a hearing I have here in

3   Philadelphia later today.

4       THE COURT:  Given the weather --

5       MR. HILSEE:  I will tell you that I am trying --

6   every 20 or 30 seconds or so the phone goes silent for about

7   10 seconds because of perhaps the duplexing problem with

8   speaker phones.  So I apologize for that.  I think I picked

9   up --

10      MR. GREENFIELD:  It's not just your phone.  It's

11  ours as well.

12      THE COURT:  Can you hear me?

13      MR. HILSEE:  I can hear you periodically.

14      THE COURT:  Yes.  Because I have been talking, and

15  I'm not sure that I'm able to be heard.  This phone system, I

16  don't know who paid for it, they obviously used all of our

17  money, but it doesn't work.  So there we are.  But there's

18  nothing we can do but struggle on through.  We have a bad

19  phone system; that's all we've got.

20      MR. HILSEE:  I heard you about the first report,

21  your Honor, and other tactics, and I'm happy to discuss that,

22  and I'm very interested in discussing the proposal that the

23  settling parties made.

24      THE COURT:  Okay.

25      MR. HILSEE:  I'll try to tick off some of the

1   important issues as we sit now.

2            The first issue is that it remains my opinion that

3   the mailing that was sent out reached a tiny fraction of the

4   class, and the mailing that was sent was sent to residents,

5   not individuals.  And millions of people, I suspect, didn't

6   read that mailing because it appeared like junk mail.

7            THE COURT:  Right.

8            MR. HILSEE:  That, in my opinion, needs to be

9   addressed and cured before -- so that we can understand truly

10  how much individual notice could have been given before we

11  attempt to reach the anonymous class members who have

12  heretofore received no notice whatsoever.

13           THE COURT:  What do you --

14           MR. HILSEE:  The publication proposal that the

15  e-mail notice proposed, it's good to add 460,000 e-mail

16  addresses, but we don't know whether those e-mail addresses

17  are e-mail addresses of folks who already were sent a paper

18  mailing previously, so I can't discern, with the information

19  provided, whether that's going to marginally increase the

20  reach at all before we determine how much and whether

21  publication notice is necessary and will be helpful.

22           The publication notice that's proposed, some

23  significant issues with that is that we determined that that

24  publication proposal will reach about half of the anonymous

25  people.  So the other half of the anonymous people who never

1    received a notice before will still not have received a

2    notice of their right.

3            There is a science, the parties' experts who work

4    for the settlement administrator would tell them that, there

5    is a science to knowing what publications will reach,

6    effectively reach a population, a target audience, of people.

7    And my opinion, and a colleague of mine who works for the

8    settlement administrator would tell you the same thing, that

9    proposal is woefully inadequate in terms of reaching the

10   class.

11           THE COURT:  But could we fix that?  I mean, is

12   that --

13           MR. HILSEE:  A third of a page is insufficient, an

14   option of increasing the size and reducing the publications

15   would have the further detrimental effects of further

16   decreasing an already woefully inadequate reach.  So I don't

17   support the publication proposal.

18           My position is that I'm anxious to see the mailing

19   list work be performed properly so that I can understand

20   whether we can boost the reach by individual notice to --

21   substantially.  And I'm focused on that because that is the

22   primary and simplest and best way of increasing the response

23   rate.

24           E-mail notice and publication notice, your Honor,

25   I'm gravely concerned that you're going to be disappointed

1    with the response rate if that is what is relied upon.

2          THE COURT: Can you hear me, Mr. Hilsee? Because I

3    would like to interject something.

4          Can you hear me?

5          MR. HILSEE: Yes, ma'am.

6          THE COURT: All right. The settling parties

7    report, if I understand correctly, that a re-mailing would

8    cost $4 million, which is the extent of the settlement fund.

9    Now, I don't know if mailing can be done less expensively

10   than that, but I don't see any point in exhausting every

11   penny in the settlement fund in a re-mailing.

12         MR. GREENFIELD: Your Honor, Richard Greenfield.

13   May I be heard on that point?

14         THE COURT: Of course.

15         MR. GREENFIELD: If one of the concerns that we

16   have is exhausting this fund because AmEx and Rust Consulting

17   intentionally took shortcuts that they knew or should have

18   known would end up not reaching large numbers of class

19   members, and I think if there is an incremental cost for a

20   new mailing, that's got to come out of AmEx's pocket, not

21   from the settlement fund. And certainly Rust Consulting can

22   contribute to that. They got paid a million three to do a

23   very skimpy mailing.

24         THE COURT: I don't know if we'd have a settlement

25   if I were to go along with you. I think we would be back to

15

1    ground zero, and the question would be whether we have a

2    settlement.

3            Now I think, reading over some of the materials

4    here, I think there is a grave question about whether there

5    ought to be a settlement in this case.  This may be an

6    unmanageable class just because of the anonymity of it, but

7    the idea that we're going to all of the sudden scrap the

8    settlement and start from scratch, I'm not really anxious to

9    take that on.  So I don't know that that's a good suggestion.

10           MR. GREENFIELD:  Your Honor --

11           MR. HILSEE:  Your Honor, this is Mr. Hilsee.

12           THE COURT:  Yes.

13           MR. HILSEE:  If I might add to that, or to answer

14   your question, I don't believe at all that the $4 million

15   figure is accurate.

16           THE COURT:  Okay.

17           MR. HILSEE:  What we know is that 4.6 million class

18   member addresses were provided to Rust Consulting.  I

19   discussed in detail in my report this improper householding

20   process that resulted in individual human beings being

21   stripped off the list, and then the notice being mailed to

22   unique addresses only, and the outside of the mailing being

23   addressed to resident.  And the problem is we don't know how

24   big that mailing list is really in terms of the net number of

25   persons because of the process.  I articulated action step A,

1    which was detailed, careful, and really routine that Rust

2    Consulting uses all the time to do it properly.

3            And once we have that figure, I can tell you when

4    we know how big the list is, I suspect the list is maybe --

5    let's take a guess here and say it's 2 million instead of the

6    1.2 million that was mailed.  To mail a postcard to 2 million

7    people would cost nowhere near $4 million, it would cost

8    closer to between 500,000 and a million.

9            So I don't think it's out of the realm of

10   reasonable, even within the so-called budget that this

11   settlement structure applies, you know, if it does -- if it

12   does -- if a settlement proposal as the parties are

13   discussing, if indeed a settlement proposal can create a

14   budget for notice.

15           THE COURT:  So Mr. Hilsee, let me ask you this:  If

16   I were to say that I want to go with your suggestion that we

17   do the re-mailing, and we exhaust $500,000 of funds, what do

18   we do if that's unsuccessful?  The settling parties think

19   that the yield is going to be very, very small.  You think

20   the yield is going to be large.

21           It occurs to me that you can prolong the process by

22   taking 10 percent and seeing whether you get an increase in

23   yield or not.  I mean, there is a way of doing this without

24   exhausting all those moneys.  But I guess I'm just wondering

25   if we do this, are we then done.  If we do a re-mailing, are

1    we then done.

2          MR. HILSEE:  I can tell you my experience and my

3    opinion from doing this for 20 years, working with varieties

4    of different settlement offers and what makes a class member

5    respond or not respond, there are many, many factors,

6    clearly, there are many, many variables.  I can't sit here

7    and tell you what the response rate will be, but I can tell

8    you this:  The response rate to a mailing address to a human

9    being that includes a claim form with a simple,

10   easy-to-fill-out claim form that they can put in the mail and

11   send back would have monumentally increased the response

12   rate.  And it is the single most, at best, probability of

13   increasing the response rate, which was your Honor's concern

14   at the time of the -- you reviewed this settlement.

15          THE COURT:  How would we go about --

16          MR. HILSEE:  I'm gravely afraid that you would be

17   concerned and disappointed with the response amongst

18   anonymous people to a small-space publication notice, and as

19   much as I believe -- because I articulated it should be done,

20   e-mail notice will not be as responsive by far as a mailed

21   notice with a claim form, which is -- which I believe is what

22   the class members deserve and which is standard practice.

23          THE COURT:  How would we go about coming up with a

24   reliable cost figure for that kind of a re-mailing?

25          MR. HILSEE:  Well, I think, your Honor, I would

1     suggest that the parties perform my action steps.  My action

2     steps that I articulated in my October 22nd tactics were

3     pretty specific in terms of generating the information I

4     would need.  Action steps A and B do not involve executing

5     the re-mailing.  Action steps A and B would take about a week

6     for the settlement administrator and the parties to execute,

7     in my view --

8               THE COURT:  Okay.

9               MR. HILSEE:  -- given the data they have, and then

10    I would have the information I need --

11              THE COURT:  Okay.

12              MR. HILSEE:  -- to report to you what should be

13    done from that point.  And we could move swiftly through the

14    rest of my action steps from that point forward.

15              But I don't have action steps A and B performed as

16    we sit here, and like I said, they're simply -- those action

17    steps are simply accumulating the mailing and individual

18    notice piece data, which wasn't done previously.

19              THE COURT:  Let me ask you this.

20              MR. HILSEE:  So if performing that mailing list

21    works, in my opinion that should be the first order of

22    business.

23              THE COURT:  And what about steps 1 and 2 that the

24    settling parties have suggested, which has to do with e-mail

25    addresses of complainers and the 460,000 e-mail addresses

1    that have been accumulated?

2        MR. HILSEE: Well, they're helpful, but they've

3    cherry-picked a few of the topics, only two of a -- of items,

4    but we don't have any data to really use any of that

5    information. We don't know -- as I said, we don't know

6    whether those e-mail addresses are e-mail addresses that

7    pertain to entirely new folks who never received a mailing

8    before, or are they the e-mail addresses of folks who

9    received a mailing. I don't know.

10       THE COURT: Hold on a second. Somebody wants to

11    speak.

12       MR. HILSEE: The 2,000 is obviously a small number

13    when you're talking about a class that I calculated to be

14    between 17 and 36 million people.

15       THE COURT: Mr. Hilsee --

16       MR. HILSEE: And no effect whatsoever on a response

17    rate.

18       THE COURT: One of the wonderful things about this

19    telephone system is that people in your position, Mr. Hilsee,

20    can't hear that those of us in the courtroom have something

21    to say. I live with this every day. I can't imagine what

22    kind of -- what an investigation of how these phones were

23    bought would produce.

24       But anyway, somebody wants to speak here.

25       MR. BERNARD: I just wanted to answer the question,

1    Judge.

2              THE COURT:  Yes.

3              MR. BERNARD:  I don't think it actually

4    significantly advances the ball much, frankly, in terms of

5    what we need to do next.  But to answer the question, those

6    400 something thousand e-mail addresses are among the people

7    who already received paper notice.

8              THE COURT:  All right.  Let me tell you, I think

9    what we ought to do here -- let me ask you one more question,

10   Mr. Hilsee, and then I think I'll hear from everybody, but I

11   think I'm ready to go.

12              I think if you have reasonable confidence,

13   Mr. Hilsee, that a re-mailing is going to be our best first

14   step, I'm willing to go in that direction.  I think the only

15   question is if it doesn't work, are we close to done.  I

16   mean, I really don't want to exhaust this whole settlement

17   fund in futile efforts at publication, which I think are

18   going to be futile at this point -- maybe not -- but that's

19   what concerns me.

20              MR. HILSEE:  I would be happy to design a formal

21   notice that can be proposed to you, your Honor, to be used

22   for a re-mailing in response to your remarks just now.

23              I will say also that obviously we don't know what

24   the response will be.

25              THE COURT:  Right.

1           MR. HILSEE:  You know, notice can't control, of

2      course, the other factors that may be affecting response

3      rate.  It is certainly -- it's certainly an issue that for

4      many of these folks they have lost, destroyed, they don't

5      have their card number, and to make many of the types of

6      claims under the settlement a card number is required.

7           So they may look at it and say I don't have my

8      card, so I'm not going to claim.  Of course, there is the

9      attestation claims opportunity, and then the issue is is it

10     attractive to a potential respondent to receive a $5.00

11     payment where I have to provide my bank account number, or my

12     American Express credit card number.  That may restrict

13     response.

14          Of course, I did observe a positive, you know, I

15     thought a very well-intentioned response on the part of the

16     settling parties to, I think, to offer that checks could be

17     mailed to attestation claimants.

18          THE COURT:  Let me hear from everybody.  I think

19     that rather than go through the steps 1, 2, and 3 suggested

20     by the settling parties, I would prefer to go through action

21     steps 1 and 2 suggested by Mr. Hilsee.

22          I mean, what we have tried to do here without any

23     expertise has failed, and Mr. Hilsee comes to us with some

24     expertise.  I am not -- we've already tried some

25     publications, so I think if we tried better mailing notice,

1  at some point we might be able to say we've done all we can

2  do.  That's where I'd like to get to.  I would like to get to

3  a point where we can sincerely say we've expended as much as

4  is reasonable to expend here and we've done the best we can

5  do.

6          I think the re-mailing, based on Mr. Hilsee's plan,

7  to me, takes us the closest to saying we've made a reasonable

8  effort to do the best we can do.

9          So let me hear from the parties, but I'm inclined

10  to go in that direction.

11          MR. GREENFIELD:  Your Honor, this is Richard

12  Greenfield.  We agree with that approach, and I have a

13  suggestion that might give us breathing room instead of

14  putting in an arbitrarily short deadline for people to

15  respond to a mailing notice in terms of claims.  Perhaps if

16  we extend the time out and the response rate still is low, we

17  then have room to do the relatively cheaper e-mailing, which

18  is one of the cheapest things, and also publication.

19          THE COURT:  I don't even know -- maybe I missed

20  something or maybe it's been awhile since I've read this, but

21  how long is Mr. Hilsee -- Mr. Hilsee, are you suggesting for

22  a response, and then I'd like to know, Mr. Greenfield, what

23  you're suggesting.

24          MR. HILSEE:  If you're referring to the -- from the

25  time a mailing is sent --

1          THE COURT:  Yes.

2          MR. HILSEE:  -- to how much time the respondent has

3     to fill out a claim form --

4          THE COURT:  Correct.

5          MR. HILSEE:  -- it can be anywhere your Honor's

6     choosing, anywhere, in my opinion, from at least 30 days, and

7     I would suggest longer is better.

8          THE COURT:  And Mr. Greenfield, what do you want it

9     to be?

10          MR. GREENFIELD:  I think if we want to leave room

11     for a secondary form, tertiary form of notice, there is no

12     harm in providing that claims have to come in within 30 days

13     or 45 days.  I have no problem with that.  But with the idea

14     that if the response rate is still very low, that we keep

15     open the option of the other means of notice.

16          THE COURT:  Well, no one is saying that we're not

17     going to do that.  I'm just saying that from my point of view

18     I think we have to make practical efforts to do the best we

19     can, and at some point we have to stop expending all the

20     money on notice.  We've got to do the best we can.

21          Why don't we just deal with today's issues today,

22     and we see what the cost is, and we see what the response

23     rate is, then we can see if there's justification for

24     spending more money to do anything else.  But I don't think

25     we can tell at this point.

1    MR. GREENFIELD:  Your Honor, may I also suggest --

2  this is Mr. Greenfield again -- that another way to boost up

3  the response rate would be to enclose a business reply

4  envelope.  The advantage of that is then someone doesn't have

5  to say, gee, I've got to spend 45 cents just to put this

6  claim in.  And you're only going to have to pay out of the

7  settlement fund for those envelopes that actually come in.

8    THE COURT:  You know --

9    MR. GREENFIELD:  And it's only 40 cents more than

10  the cost of the postage.

11    THE COURT:  We're paying Mr. Hilsee a ton of money

12  to advise us how to put this notice together.  I can't

13  believe that he doesn't know about this possibility.  And if

14  he thinks it's important, I think he'll recommend it, and if

15  he doesn't think it's important, I don't think he will.

16  We're talking about having the possibility of e-mail notice

17  -- they can respond by e-mail, correct?  Or on the internet

18  or something.

19    MR. BERNARD:  Yes, your Honor.  Can I --

20    THE COURT:  Yes.

21    MR. BERNARD:  Can I just be heard on the

22  fundamental point --

23    THE COURT:  Mr. Greenfield --

24    MR. HILSEE:  The question is whether giving the

25  class member, the respondent, a pre-postage paid return

1    envelope, that's certainly going to help.  Definitely.  Any

2    convenience like that will help with a response.  It of

3    course will add to the cost.  As Mr. Greenfield pointed out,

4    everyone who responds, parties will pay for the postage for

5    those responses.  And if the response is very, very

6    successful, then the cost goes up.  There is no specific

7    studies on the -- that I'm aware of on the uptick in response

8    where there's a postage-paid envelope provided.

9            THE COURT:  Okay.  Hold on a second.  Mr. Ryan

10   would like to say something.

11           MR. BERNARD:  Mr. Bernard.

12           THE COURT:  I'm sorry, Mr. Bernard.

13           MR. BERNARD:  No problem, Judge.

14           I just want to try to shed a little light, because

15   while we're talking about all these steps on the cost issue

16   and how we're trying to get around that and how we can

17   confront the reality of what we have, so let me give the

18   Court some numbers.

19           As I mentioned earlier, we have a pot now that's

20   $3.9 million.  If you look at an exhibit from Rust, which was

21   part of the preliminary approval papers, which is how we

22   calculated our estimates of how much this would cost, there's

23   a letter from Rust which sets forth their proposal.  And at

24   the end of it, Rust gives price quotes for various things.

25   And I just want to walk through that for a second.

1    This was based on postcard notice, and for a

2    mailing size of 2 million, their estimate was 1.252 million,

3    which is in fact, I think, roughly what we ultimately paid

4    them.  For a mailing size of postcards only of 3.8 million,

5    their estimate was 2.297 million.

6    What we did was we extracted from that 3.8 million

7    and said well, let's assume it is the full number of records

8    that we have pre-householding, which is four million six

9    hundred and something thousand records.  We said let's use

10   that 2.2 million number, let's change it to account for the

11   fact that we're not sending out a postcard notice, which

12   costs less, but a first class envelope notice, and that's how

13   we came up with the $4 million number, Judge.

14   And the reality here is that if we send out, even

15   just to use round numbers, a four million first class postage

16   mailing number of envelopes at 45 cents an envelope, we're

17   talking about roughly $2 million.  If we include a

18   postage-prepaid envelope within that, we're talking about

19   another $2 million.

20   And so the reality here is that yes, we can go

21   back, we can look through Mr. Hilsee's action items A and B,

22   but we're starting with a number that's so large, 4.6

23   million, and what -- as I understand it, what Mr. Hilsee is

24   saying is okay, we've got 4.6 million; what is that?  That's

25   4.6 million records of a gift card transaction.  Now, he

1    would de-dupe that for exact names and exact addresses.  And

2    the hope is that that 4.6 million number comes down to a

3    number that's low enough to justify re-mailing given the

4    costs associated with doing that.  As I stand here right now,

5    I agree, I don't have that statistic for the Court.  I can't

6    tell the Court if we eliminate just the exact matches, what

7    number do we have.  But I suggest that before we do an awful

8    lot of other steps, let's just do that.  Let's find out what

9    our base case is.

10            THE COURT:  That's what I'm trying to do.  What I

11   understand we're going to do is that Mr. Hilsee is going to

12   work with the settling parties, and try to come up with a

13   list, and then give us some kind of cost estimate of what a

14   re-mailing in the way that Mr. Hilsee would like to see it

15   would cost.

16            Am I correct?

17            MR. BERNARD:  Yes, just with the rub, Judge, that

18   actually the action items in A and B have a lot more steps

19   than that, and I was trying to simplify it, because I think

20   the core of it is, for example, A and B also have trying to

21   figure out which cards are active and inactive.  It also has

22   reaching out to mall partners.  What I was trying to do was

23   just get down to the core of from this 4.6 million, if we

24   de-duped it only for exact matches, how many we would have.

25   If, as I suspect, that number is still four million, unless

1  someone has a cheaper way to send an envelope, base postal

2  costs are going to cost $2 million.

3         THE COURT:  Mr. Hilsee, based on all of this, what

4  do you want to do?

5         MR. HILSEE:  My recommendation, your Honor, would

6  be to have the claims administrator perform the physical

7  mailing list tactics that I have suggested within part B,

8  tactic B on page 3, that starts on page 3 of my October 22nd

9  report --

10        THE COURT:  Okay.

11        MR. HILSEE:  -- and the parties do point out in

12 there that I -- my objective in looking at the issues that we

13 were dealing with are are we capturing all reasonably

14 available readily identifiable individual names and

15 addresses.  And I suggested in there -- and the parties

16 haven't addressed it in detail, whether it would be whether

17 there are class member names and addresses readily available

18 from mall partner releasees.

19        So that is a tactic inside of my physical mailing

20 list tactics.  And I suggest that that be considered, because

21 I think my research shows that they do capture names and

22 addresses of class members.

23        THE COURT:  How would we do that, and what would

24 that cost?

25        MR. HILSEE:  Physical mailing and e-mailing.  But

1    if we're talking only about re-mailing to some portions -- to

2    the 4.6 million records, then the mailing list processing

3    steps I do articulate in detail on page 4, item 4 of my

4    October 22nd report, and I do agree that those steps should

5    be taken, and then we will know how big that re-mailing needs

6    -- will be in order to send a notice to individuals.

7              THE COURT:  So am I correct that we will be able to

8    get an accurate cost estimate of a re-mailing before we send

9    the money?

10             MR. HILSEE:  Yes.

11             THE COURT:  Okay.  And what are we going to do

12   about mall partners?

13             MR. BERNARD:  May I speak to that, Judge?

14             THE COURT:  Yes.

15             MR. BERNARD:  Because I did look into that after

16   Mr. Hilsee raised it and to be prepared today.

17             So the answer is there are 32 mall partners that

18   AmEx provides what I would call backbone service to.  They

19   are at some 600 something locations.  I can explain it in

20   more detail, but the bottom line is AmEx does not have the --

21   whatever information the mall partners captured about the

22   people that purchase their gift cards, AmEx does not have it.

23             THE COURT:  I think that the assumption is that

24   AmEx doesn't have it, but the question is whether you can get

25   it from the mall partners.

1    MR. BERNARD:  I don't know if we asked them if they

2    would give it to us or if they would have to be subpoenaed in

3    order to give it to us.  I don't know the answer to that.

4    THE COURT:  Well, is it that expensive, if there

5    are only 32 of them, to ask them?

6    MR. BERNARD:  Other than lawyer time associated

7    with that, Judge, and the time at AmEx to try and do that,

8    no, there is no other cost associated with that, but again, I

9    suppose, Judge, the question just really is, I mean, at some

10   point --

11   THE COURT:  Well, you know, I've got to end this,

12   because I think we're going around and around and around.

13   Why don't we just do the mailing part of this and get back

14   together and see where we are before we talk about expending

15   anything else.  Ultimately we're trying to do the best we

16   can.  We're not trying to get perfection here.  And the

17   problem is what we did before was obviously very poor.  We're

18   trying to do a little better.  But I don't know that we have

19   to do everything.  I think at some point -- we've already

20   done one kind of publication, at some point we're going to

21   just say this is all we can do.

22   MR. BERNARD:  May I make one other suggestion?

23   THE COURT:  Yes.

24   MR. BERNARD:  I do think that in terms of providing

25   a reasonable estimate to the Court of what this might cost,

1    and I don't want to bog your Honor down in details, there are

2    quite a few steps in this step B that also involve going to

3    LexisNexis to try and determine new addresses.  What I'd

4    really like to do in the first instance is take the universe

5    of addresses that we have, figure out how many exact matches

6    there are, and get that number, because honestly, that can be

7    done pretty efficiently, as opposed to --

8             THE COURT:  Let me see what Mr. Hilsee thinks about

9    that.

10            Mr. Hilsee, what do you think about that as a first

11   step?

12            MR. HILSEE:  The phone cut out.  I'm so sorry, your

13   Honor.  But I believe the discussion was should we just --

14   the proposal from the settled parties was just get the exact

15   name and address --

16            THE COURT:  If you hold on, we'll tell you what it

17   is.

18            MR. BERNARD:  Mr. Hilsee, can you hear me now?

19            MR. HILSEE:  Yes.

20            MR. BERNARD:  Just to be very precise about it,

21   what my proposal would be is to take the database that

22   already exists of the 4.6 million names that was obtained for

23   Rust from which the de-duping was done, but take that 4.6

24   million list, and let's just figure out before we run

25   anything through LexisNexis or the national update database

1   of addresses, let's just find out how many exact matches

2   there are in that database, and then we'll have at least a

3   base number.  Obviously that base number could change based

4   on people who truly are unavailable, who truly have moved,

5   but I don't think it would move much, and my instinct is in

6   the first instance let's just figure out how much we can

7   reduce, if we can, that 4.6 million number to a number that's

8   just pure non de-duplicate names.

9            MR. HILSEE:  Here's the problem with that.  The

10  problem with that is that your mailing list that has -- I'm

11  just going to use an example -- Joe Smith and John Smith at

12  the same address.  What you're saying -- let me be clear.

13  You're saying for the moment we're going to leave those two

14  people on the list.

15           MR. BERNARD:  Correct.  They would not be a pure

16  duplicate.  As I understood your proposal --

17           MR. HILSEE:  Right.

18           MR. BERNARD:  -- we're talking about exact

19  duplicate of names and addresses.  So what that means is,

20  take my name, James Bernard, at my home address.  If there

21  are four records of gift guards that I purchased in this

22  database, there will now be four of the 4.6 million because I

23  purchased four.  You would take me and reduce me to one.

24           If, however, there is James Bernard, and there is

25  Connor Bernard, my son -- who's eight and can't buy gift

1  cards, but you get the point -- we would keep him in there,

2  because we have both a name and an address.  The address is

3  the same, but the name is different.  So we keep him in

4  there.  It would have to be a pure duplicate as I just

5  described.

6          MR. HILSEE:  I understand it now, and I agree that

7  that would be the first step.  And from that we can at least

8  know how big the mailing list will be, and from that, of

9  course, we can get an estimate for the cost to do a

10  re-mailing.  And meanwhile I can design a proposed form of

11  re-mailing that can be used to calculate the cost.

12          THE COURT:  I think we ought to start with that.  I

13  think --

14          MR. BERNARD:  That's fine.

15          THE COURT:  How about that?  And then when should

16  we -- how long should we allow to get back together and talk?

17  You want to let me know, Mr. Hilsee, when you're ready and

18  we'll set up a conference?

19          MR. HILSEE:  I think the parties need to discuss to

20  basically get Rust Consulting started on doing this, and I

21  wouldn't think it would take them more than a week.

22          THE COURT:  My guess is that --

23          MR. HILSEE:  (Inaudible).

24          THE COURT:  My guess is that --

25          MR. HILSEE:  (Inaudible).

1          THE COURT: Mr. Hilsee --

2          MR. HILSEE: And Rust is a good one, they should be

3    able to do that piece, they need to do that piece. Meanwhile

4    I would ask for two weeks to write and design a form of

5    notice, and maybe that would give Rust another week to be

6    sure that it has its number accurate.

7          THE COURT: Mr. Hilsee, you just let me know when

8    you're ready, okay? Because I think with the holidays coming

9    up things are going to take longer than any of us anticipate.

10   So as soon as you're ready, we'll get everybody back together

11   and we'll take the next step.

12         MR. BERNARD: Judge, I just want to put something

13   else on the record that we can work with Mr. Hilsee on, and

14   it's minutia, but it actually is important because of the

15   nature of data inputting.

16         If, for example, I live on Wilshire Drive, and

17   rather than writing out "drive" the second time I make a

18   purchase, I write d-r, d-r period, it will not show up when

19   you do a pure electronic de-duping as a dup, because it's

20   not. One uses the word drive, the other uses d-r. We'll

21   probably have to work with Rust and with Mr. Hilsee, because

22   there is a judgment that needs to be made about whether or

23   not something is a duplicate.

24         THE COURT: Are you simply asking that at this

25   point I give everybody permission to talk to one another

1    while this process is going on?

2             MR. BERNARD:  Precisely.

3             THE COURT:  I'm perfectly willing to do that.

4             MR. HILSEE:  I agree with that, and I appreciate

5    that, your Honor.  And I believe that Rust and other

6    administrators have sophisticated techniques --

7             MR. BERNARD:  They do.

8             MR. HILSEE:  -- to account for the circumstance

9    that was just mentioned.  That's very true.

10            MR. BERNARD:  They do.  And I just want everybody

11   to be clear that when we talk about an exact duplicate, we're

12   going to have to work with each other.

13            THE COURT:  I think common sense has some role to

14   play.

15            MR. BERNARD:  It sure does, but...

16            THE COURT:  Okay.  We're fine on the first step,

17   and we're going to get back together as soon as Mr. Hilsee is

18   ready and we've got an exact cost estimate and we've got a

19   notice.  Is that where everybody is?

20            MR. BERNARD:  If I may, it's up to Mr. Hilsee.  I

21   think before he spends the time and effort drafting what a

22   notice would look like and everything else, let's see what

23   the numbers tell us.

24            THE COURT:  That's fine.

25            MR. BERNARD:  Because depending on what the numbers

1    tell us, we may have certain constraints.

2             THE COURT:  Okay.  So let's get back together when

3    we have a mailing list and some cost figures.  Is that okay,

4    everybody?

5             MR. HILSEE:  Okay.  Thank you.

6             THE COURT:  Okay.  Hold on.  Rhonda is here and

7    saying wait.

8             THE CLERK:  Mr. Greenfield was here, he got cut

9    off.

10            THE COURT:  You know what?  Somebody is going to

11   have to tell him, because I've got another hearing, and I've

12   had it.

13            Is everybody fine?  Okay.  Thanks everybody.

14            THE COURT:  Somebody should tell Mr. Greenfield

15   what happened.  It's not going to be me.  Thank you.

16       (End of proceedings.)

17                    C E R T I F I C A T E

18

19       I certify that the foregoing is a correct transcript

20   from the record of proceedings in the above-entitled case on

21   December 20, 2012.

22

23

24   /s/Colette M. Kuemmeth
           Court Reporter
25