**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SAUL M. KAUFMAN and KIMBERLY STEGICH, individually and on behalf of all others similarly-situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 07-cv-1707 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| AMERICAN EXPRESS TRAVEL RELATED SERVICES, CO. | ) ) | CLASS ACTION |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

Before the court is the settling parties' motion for final approval of the Settlement

Agreement ("Agreement") [Dkt. 356] with accompanying memorandum of law [Dkt. 598] and

lead and additional class counsel's motion for approval of attorneys' fees [Dkt. 584].  Also

before the court is the petition of counsel for Intervenors for attorneys' fees and reimbursement

of expenses [Dkt. 583].  The court held a fairness hearing on January 22, 2016 [Dkt. 613] and the

parties reported more definitive figures for the number of claims that were made and the amount

of money being received by the claimants pending court approval of the settlement.

Having studied the Agreement and the relevant briefing that has extended over an almost

seven-year period, the court is stuck between a rock and a hard place.  By granting final

approval, the court is acquiescing in a fundamentally problematic practice whereby attorneys for

plaintiffs in class actions derive a greater monetary benefit from a settlement than their

respective clients, even when all the class members' returns are added up.  By denying final

approval, the court would, for the third time, ask the parties either to (1) spend even *more* money

from the settlement fund to resend notice to current and/or potential claimants; or (2) walk away

from the settlement and potentially leave the claimants with nothing, thereby allowing American Express Travel Related Services Co. ("American Express") to save upwards of $6.75 million and denying the attorneys for the class any benefit, even though they have provided a valuable public service as private attorneys general. The court chooses what it perceives to be its least bad option and grants final approval. The court will also grant in part and deny in part the petitions for attorney fees filed by lead class counsel, additional class counsel, and counsel for Intervenors. Finally, the court confirms its prior approval of an incentive award of $1,000 for each of the class representatives and denies American Express' request for reimbursement for the first round of notice in this case.

## I.     BACKGROUND

### A.  History of the Litigation

Plaintiff Saul M. Kaufman ("Kaufman") filed a putative class action lawsuit against American Express in the Circuit Court of Cook County on February 14, 2007. He alleged breach of contract, unjust enrichment, and statutory fraud. American Express then filed a notice of removal to federal court on March 27, 2007, pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) ("CAFA"). On May 1, 2007, American Express filed a motion to compel arbitration and stay proceedings. On March 7, 2008, this court denied American Express' motion. *Kaufman v. American Travel Related Services Company, Inc.*, No. 07 C 1707, 2008 WL 687224 (N.D. Ill. Mar. 7, 2008). American Express appealed this court's March 7, 2008 decision to deny its motion to compel arbitration to the Seventh Circuit Court of Appeals. Upon the parties' request, the Seventh Circuit, on February 4, 2009, remanded the case to this court for the purpose of conducting settlement approval proceedings. American Express' appeal has remained pending during the parties' settlement efforts.

On April 30, 2009, proposed Intervenors J.L. Goodman ("Goodman") and Carla Santsche ("Santsche") (collectively, "Intervenors") filed their motion to intervene in the case. This court granted the Intervenors' motion in part, allowing them access to all "confirmatory discovery" that had been and would be conducted. At around the same time, on May 14, 2009, a stipulation was filed allowing Gordon Jarratt and Amanda Rudd to intervene.

An amended class action complaint was filed on July 13, 2009 alleging breach of contract, statutory fraud, and unjust enrichment. More specifically, plaintiffs allege that American Express misrepresented the value of its gift card products because the gift cards could be used only at select retailers, could not be used in conjunction with another form of payment (split-tender transaction), and any unused available funds reverted back to American Express by way of various fees. On the same day, class plaintiffs filed a motion for preliminary approval of class action settlement. According to the motion for preliminary approval, class plaintiffs and American Express began settlement negotiations in April 2008 under the guidance of Rocco Spagna, Esq. and the Seventh Circuit Mediation Program. Those negotiations, which included full-day mediation sessions with Hon. William J. Cahill (Ret.) of JAMS Mediation, resulted in a Memorandum of Understanding ("MOU") executed on January 8, 2009. Approximately one month later, on February 10, 2009, the parties executed a Fee Agreement.

**B.  The Settlement Agreement**

 **i. Denial of the Amended Motion for Preliminary Approval**

Pursuant to the preliminary agreement between the parties, the potential class members were to be notified of the terms of the Settlement Agreement and details regarding the process of how to object to the terms of the settlement or opt-out of the class via publication. [Dkt. 85] In addition, the Settlement Agreement set aside a maximum of $3,000,000 for claims filed by class

members.  [Dkt. 85-2, p. 5] The payout of benefits depended on the type of claims made and was

outlined in the proposed Settlement Agreement, Section 3.3.  [Dkt. 85-2, p. 11] There were four

different types of claims that could be made: split-tender claims, monthly fee claims, check

issuance fee claims, and attestation claims.  The settlement agreement allowed for counsel for

class plaintiffs to make an application for an award of no more than $1,250,000 in attorneys' fees

and no more than $25,000 in costs and expenses.  Furthermore, the agreement provided an

incentive award of $2,500 to named plaintiff Kaufman and $1,000 to additional named plaintiff

Kimberly Stegich.  [Dkt. 85-2, p. 14]  American Express agreed not to object to plaintiffs'

counsel's petition for the full amount of $1,278,000 (fees plus expenses and incentive awards).

[Dkt. 85-2, p. 15]  Finally, the agreement had a provision that allowed up to $650,000 to revert to

American Express to reimburse it for the cost of notice and administration.  [Dkt. 85-2, p. 17]

Because of an objection filed by Intervenors Goodman and Santsche, and perhaps recognizing

the Seventh Circuit's general disdain for the reversion of unused settlement funds to defendants

in class actions, *see Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004), the

settling parties submitted an amended motion for preliminary approval that included a *cy pres*[1]

provision before the court could rule on the motion for preliminary approval.

In its December 22, 2009 opinion denying the amended motion for preliminary approval,

this court noted that including a *cy pres* provision did not resolve the issue of the reversion of

funds to American Express.  [Dkt. 128]  The *cy pres* provision allowed for the first $200,000 in

unclaimed funds to be directed to a charity.  However, anything above $200,000 would still

revert to American Express, up to $650,000.  The court found a few other deficiencies in the

---

[1] "*Cy pres* (properly *cy près comme possible*, an Anglo–French term meaning 'as near as possible') is the name of
the doctrine that permits a benefit to be given other than to the intended beneficiary or for the intended purpose
because changed circumstances make it impossible to carry out the benefactor's intent." *Pearson v. NBTY, Inc.*, 772
F.3d 778, 785 (7th Cir. 2014).

proposed settlement agreement. For one, the court was not satisfied with the substance of the notice that was to be provided to the class. The proposed notice to the class failed to include such basic information as the scope of the claims to be released, any special benefits or incentives to the class representatives, or even the address of class counsel. [Dkt. 128, p. 12] The court was also dissatisfied with the abnormally high incentive award to the class representatives, especially in light of the relatively low payouts for the members of the class who actually submitted a claim.

In the same order, the court certified a settlement class, appointed class representatives, appointed class counsel, determined that the $3,000,000 fund for class claims was within the range of reasonable settlements, and approved publication as a proper method of notification. [Dkt. 128, p. 23] Normally, Federal Rule of Civil Procedure 23 requires that the court be satisfied that the notice is the "best notice that is practicable under the circumstances, *including individual notice to all members who can be identified through reasonable effort*." *See* Fed. R. Civ. P. 23(c)(2)(B) (emphasis added). The court approved publication as the method of notification based on American Express' representation that individual notice would be impracticable or impossible due to the anonymity of the class. [Dkt. 128, p. 13] The court expressed concern over whether individual notice was actually impracticable as the parties did not attach any documentary evidence attesting that purchaser- or user-identifying data was not preserved. [Dkt. 128, p. 13]

### ii. The Parties' Fail to Address Issues in December 22, 2009 Order

When the parties attempted to address the issues outlined in the order denying preliminary approval, it became apparent that American Express did in fact have a limited amount of customer-identifying information. [Dkt. 205, p. 5] American Express admitted that it

could link a substantial number of cards against which fees were assessed to customer-identifying information that it maintains, whether in its normal data storage or in its backup data storage.  [Dkt. 205, p. 5]  This information was neither obtained nor even sought by class counsel at the time they negotiated the settlement with American Express.  Moreover, American Express argued that, while it did have some individual customer information, accessing the information would be prohibitively expensive.  [Dkt. 205, p. 6]

In once again denying preliminary approval, this court noted that the Supreme Court has held that the "reasonableness" requirement in Rule 23 pertains to the effort expended to identify class members, not the cost incurred in providing such notification.  [Dkt. 205, p. 6, *citing Eisen v.Carlisle & Jacquelin*, 417 U.S. 156, 176 (1974)]  Therefore, the parties were directed to conduct discovery to determine whether individual notice could be achieved.  Additionally, the court determined that the substance of the notice was still deficient as the description of the release was beyond the comprehension of the average reader.  [Dkt. 205, p. 4]  Further, the court was satisfied with the reduction in incentive awards to the representative parties to $1,000 each.  Finally, the court approved the *cy pres* provision but still disapproved of American Express' right to reimbursement.

### iii.  Preliminary Approval is Granted

Preliminary approval was finally granted on September 21, 2011 after the settling parties filed their second amended motion for preliminary approval.  The second amended motion for preliminary approval was the result of additional negotiations between the settling parties with the assistance of Magistrate Judge Martin C. Ashman.  [Dkt. 311, p. 2]  According to the second amended motion, the settling parties increased the size of the settlement fund from $3,000,000 to

$6,753,269.50.[2]  The second amended motion also stated that the class members would be notified by publication *and* by direct mail for every class member whose address American Express had in its file.  Additionally, the court approved the substance of the notice.  The settlement class was defined as follows:

> All purchasers, recipients, holders and users of any and all gift cards issued by American Express from January 1, 2002 through [September 21, 2011],[3] including, without limitation, gift cards sold at physical retail locations, via the Internet, or through mall co-branded programs.  Notwithstanding the foregoing, the following cards are not "gift cards" for the purposes of Settlement Class membership: (i) "Be My Guest" dining cards; (ii) any and all gift cards sold at a Westfield shopping center in California (or online in California) between November 1, 2000 and October 1, 2009 and hat bear the word "Westfield" or any Westfield logo.[4]

## C.  Final Approval

### i.  Settling Parties' First Motion for Final Approval

On February 16, 2012, the parties filed a motion for final approval of the class action settlement.  [Dkt. 356]  The terms of the settlement agreement were consistent with the terms that were presented in the second amended motion for preliminary approval.  The agreement set up a Settlement Fund worth $6,753,269.50, which was broken down as follows: $1,224,269.50 for publication and direct mail notice; $1,525,000 for attorneys' fees ($1,275,000 to lead class counsel and $250,000 to additional class counsel); $4,000,000 to satisfy split-tender claims, monthly fee claims, check issuance fee claims, and attestation claims.  [Dkt. 356, pp. 5-6]

---

[2] The increase in the settlement fund "for the benefit of the class" [Dkt. 311, p. 4] is misleading because the original $3,000,000 fund did not include attorneys' fees or administrative costs, whereas the $6,753,269.50 did.  As will be explained in more detail, attorneys' fees, administrative costs, and *cy pres* are not considered benefits to a class. *Pearson*, 772 F.3d at 781.

[3] Original language: "the date of preliminary approval of the settlement."  Settlement Agreement at ¶ 3.2 [128]

[4] This court modified the class definition and lifted the stay on the action filed Intervenors Kambiz and Katayoun Kazemi in California, *Kazemi, et al. v. Westfield America, Inc.*, Case No. 37-2008-00075526-CU-BT-CTL.  [205] ("This evidence demonstrates a material difference between purchasers and users of American Express-branded gift cards, such as the Kaufman plaintiffs, and purchasers and users of co-branded Westfield gift cards, such as the Kazemi intervenors:  American Express retains some customer-identifying information with regard to the former group, but has none as to the latter.")

Whatever money was not claimed by the class members from the $4,000,000 pot was set aside for a *cy pres*.  [Dkt. 356, p. 6]

In addition, American Express agreed to establish two programs: (1) the Balance Refund Program; and (2) the Purchase Fee and Shipping/Handling Fee Waiver Program ("Purchase Fee Program").  [Dkt. 356, p. 6]  The Balance Refund Program would provide gift card holders with card balances of $25 or less an opportunity to request a refund of their unused balances without paying a Check Issuance Fee.  The Purchase Fee Program provided class members the opportunity to purchase a new $100 gift card without paying an up-front purchase fee ($3.95) or a shipping/handling fee ($5.95).  Both the Balance Refund and Purchase Fee Programs were to be paid by American Express *outside* of the settlement fund and were not capped by any amount.

Intervenors Goodman and Santsche filed an objection to the motion for final approval on April 2, 2012.[5]  Goodman and Santsche objected to the definition of the settlement class, claiming that the definition was too broad.  [Dkt. 372, p. 3]  They also objected based on the inadequacy of the notice program.  [Dkt. 372, p. 10]  According to the declarations submitted in conjunction with the motion for final approval, 1,279,514 notice postcards were mailed to those class members whom the settling parties could identify using American Express' records.  [375]  Of the postcards mailed, 110,375 were returned as undeliverable.  [Dkt. 375]  Additionally, notice was published in the November 3, 2011 edition of USA Today.  [Dkt. 318].  The weekday print circulation of USA Today for the period in which notice was published was approximately 1.7 million.

---

[5] Intervenors Goodman and Santsche filed numerous objections in this case in response to virtually all of the motions filed by the settling parties.

Response to the notice was abysmal. Approximately 4 months after notice was published/mailed, only 3,456 benefits of any kind had been requested, totaling $41,510.35.[6] [Dkt. 387, p. 2] The total number of claimants was not provided by the settling parties, but there could not have been more than 3,335 individual claimants since 121 claims requested multiple benefits. Given that approximately 70 million gift cards were sold by American Express during the class period, the proportion of benefits claimed to cards sold was "pitifully low." [Dkt. 387, p. 5] Had the court approved the settlement, almost 99% of the settlement fund reserved for the class would have gone unclaimed.

The court ultimately rejected final approval on June 25, 2012. [Dkt. 387] In rejecting final approval because of inadequate notice and the incredibly low claims rate, this court was forced to take the exceptional step of appointing a notice expert in order to determine the best way to reach as many potential class members as possible. [Dkt. 387, p. 7] Mr. Todd B. Hilsee was appointed as the notice expert based on the proposal of Intervenors Goodman and Santsche. The parties, under the guidance and direction of Mr. Hilsee, worked to devise a notice plan that, among other things, would reach as many class members as possible, which, in turn would increase the number of claims made and increase the benefit to the class. On July 3, 2013, the parties submitted a proposed order for supplemental notice, which was approved by the court on August 9, 2013.[7] [Dkt. 451]

### ii. Settling Parties' Second Motion for Final Approval

---

[6] Later figures given by the settling parties demonstrate that the claims rate was even lower: 2,457 claims totaling $11,377. [Dkt. 598-2, p. 32]

[7] Intervenors Goodman and Santsche voiced their objections to the proposed supplemental notice. The court agreed with Mr. Hilsee that describing the Intervenors' objections in the supplemental notice would not be neutral and would potentially prejudice class members. [Dkt. 451]

On May 28, 2015, almost two years after the court first denied final approval and approximately nine months after this court approved of the supplemental notice program devised by Mr. Hilsee, the settling parties once against filed their joint memorandum of law in support of final approval of the class action settlement. [Dkt. 504] According to the settling parties, approximately 70% of the potential class members were provided with notice, a substantial improvement over the initial notice campaign. [Dkt. 504, pp. 13-14] The total number and value of claims submitted indicated a 1200% improvement over the initial notice program. [Dkt. 504, p. 14] The class administrator received a total of 32,571 claim forms, valued in excess of $500,000, compared to the approximately 3,400 claim forms requesting $41,510.35 following the initial notice program. [Dkt. 504, p. 14]

In order to reach such a large proportion of the potential class members, the supplemental notice program included the following: individual notice by email; publication notice in several high profile publications; internet banner advertisements; a keyword search campaign; links on American Express' gift card-related sub-webpages; and significant updates to the Settlement's toll-free number's menu options, administrative site, and the long and short form notices. [Dkt. 504, p. 13] Approximately $1.2 million was expended from the settlement fund to pay for the supplemental notice program. The settling parties received five objections to the settlement, including an objection by Intervenors Goodman and Santsche. The Intervenors once again objected to the language of the release, arguing that it was overboard. They also objected to the notice program. More specifically, the Intervenors argued that the class was not provided information regarding the fee petition from class counsel prior to the deadline for objections. According to the Intervenors, class members could not make an informed decision regarding

whether they should submit a claim, opt-out, or object to the settlement without this important piece of information.

The court agreed with the Intervenors and, on December 18, 2014, denied the motion for final approval for a second time. [Dkt. 537] The court identified two flaws in the settlement agreement that needed to be corrected: (1) the court rejected paragraph 3.3(a) of the settlement agreement which reimbursed American Express for the costs incurred in the first round of notice;[8] and (2) the supplemental notice program did not comply with Federal Rule of Civil Procedure 23(h) as it would be construed in *Redman v. Radioshack Corp.*, 768 F.3d 622 (7th Cir. 2014). The Intervenors' argument that the class had to be made aware of class counsel's petition for attorneys' fees prior to the deadline for objections was, in essence, confirmed by the decision in *Redman*.[9] Another round of notice was necessary to comply with *Redman* and Fed. R. Civ. P. 23(h)

### iii.     Settling Parties' Third Motion for Final Approval

On December 11, 2015, the settling parties filed the instant memorandum in support of final approval of the class action settlement. [Dkt. 598] In the memorandum, the parties state that they have corrected the two deficiencies noted by the court in its previous ruling. Namely, notice was resent to the class to inform them of class counsel's petition for attorneys' fees and to allow them the opportunity to submit a claim, opt-out, or object in compliance with *Redman* and

---

[8] This was the third time that the court addressed the issue of reversion of funds to American Express.

[9] Between the Intervenors' objections on March 6, 2014 and this court's order on December 18, 2014 denying final approval, *Redman* was decided. Both *Redman* and Intervenors relied on the ruling *In re: Mercury Interactive Corp. Securities Litigation*, 618 F.3d 988 (9th Cir. 2010) to support their position that class counsel needed to inform potential class members of attorneys' fee petitions prior to the objection deadline.

Fed. R. Civ. P. 23(h); and American Express agreed to pay for the initial round of notice, which totaled $527,580.27.[10]  [Dkt. 598, p. 17]

## II.     LEGAL STANDARD

A court may approve a settlement that binds class members if, after proper notice and a public hearing, the court determines that the proposed settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(3). Under Seventh Circuit law, a district court must, in evaluating the fairness of a settlement, consider "the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement." S*ynfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir.2006) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir.1996)) ("*Synfuel* Factors").

"The 'most important factor relevant to the fairness of a class action settlement' is the first one listed: 'the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.'" *Synfuel*, 463 F.3d at 653 (*quoting In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th Cir.1979)).  Furthermore, "[i]n conducting this analysis, the district court should begin by 'quantifying the net expected value of continued litigation to the class.' To do so, the court should 'estimate the range of possible outcomes and ascribe a probability to each point on the range.'" *Id.* (*quoting Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284–85 (7th Cir.2002)).

---

[10] However, during the final fairness hearing on January 22, 2016, counsel for American Express asked the court to revisit its decision to bar American Express from being reimbursed for the first round of notice. [Dkt. 613]

"Federal courts naturally favor the settlement of class action litigation." *Isby*, 75 F.3d at 1196. Nevertheless, the Seventh Circuit has warned that "the structure of class actions under Rule 23…gives class action lawyers an incentive to negotiate settlements that enrich themselves but give scant reward to class members, while at the same time the burden of responding to class plaintiffs' discovery demands gives defendants an incentive to agree to early settlement that may treat the class action lawyers better than the class." *Thorogood v. Sears, Roebuck & Co.*, 627 F.3d 289, 293 (7th Cir.2010) (emphasis omitted). District courts must therefore "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions." *Synfuel*, 463 F.3d at 652.

## III.    ANALYSIS

### A. *Synfuel* Factors

The court agrees that at the time of its December 18, 2014 order, the only two outstanding issues were the payment for the initial notice campaign and the *Redman* requirement that the class be notified of the fee petition by class counsel prior to the objection deadline. The court is satisfied that those two issues have been resolved. However, in light of the attorneys' fees being sought by class counsel and counsel for Intervenors, the number of claims made by the class members, and the tremendous amount of the money that has been expended to provide adequate notice to the class, there is a genuine question as to whether the actual benefit to the class is outweighed by the benefit to the attorneys. However, before turning to the attorneys' fees sought in this case, the court must first determine whether the five factors identified in *Synfuel* have been satisfied.

### i.    Strength of the merits compared to the Settlement Amount

Generally, the most important factor in determining whether a class action settlement should be approved is the comparison of the terms of the settlement to the likely results of the litigation. *Synfuel*, 463 F.3d at 653 ("The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." (internal quotations omitted)). There are two elements in this case that weigh in favor of approval. First, the total amount of recovery to the class is within the range of reasonable settlements when compared to the total amount at issue. Second, it is possible, and perhaps likely, that, if litigated at the current time, American Express' arbitration clause would be upheld by the Seventh Circuit and the class would receive nothing.

According to the parties, the total amount at issue associated with the split-tender transactions that are at the heart of this litigation is approximately $9,688,788. [Dkt. 598, p. 27] The settling parties are correct in stating that this court previously found that the initial settlement claims fund of $3 million "was within the range of reasonable settlements" when balanced against the $9.6 million figure. [Dkt. 128, pp. 15-16] However, the parties appear to represent that because the settlement fund is now valued at over $6.75 million, the settlement is at least as reasonable, if not more reasonable, when compared to the still-pertinent estimate of $9.6 million. The settling parties admit, in a footnote, that the original $3 million settlement claims fund did not include attorneys' fees or administration costs and was solely for the benefit of the class [Dkt. 598, p. 27 n.13], whereas the current $6.75 million settlement fund includes attorneys' fees, administration costs, and a *cy pres* provision. Based on the number of claims received, only $1.3 million of the fund will be going directly to class members. [Dkt. 598-2, p. 32] Even considering the two programs established by American Express that are not being financed by the settlement fund (Balance Refund Program and Purchase Fee Program), the

benefit to the class totals just over $1.8 million. [Dkt. 598-2, p. 32] This falls well short of the $3 million originally contemplated by the court. However, given the fact that the settlement fund originally set aside $4 million for class claims (which was eroded, in part, by the two additional notice rounds), and given the defenses available to American Express, the court still finds the settlement fund to be within the range of reasonableness.

This court has been made aware by the parties that the Seventh Circuit and Supreme Court case law, as well as the trend of decisions relating to the enforcement of arbitration clauses, makes it at least possible, and perhaps likely, that its ruling on March 7, 2008 denying American Express' motion to compel arbitration could be overturned. [Dkt. 531, pp. 24-27]. *See Am. Exp. Co. v. Italian Colors Rest.*, 133 S.Ct. 2304, 2309 (2013); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351-52 (2011); *see also Gore v. Alltel Communications, LLC*, 666 F.3d 1027, 1032-33 (7th Cir. 2012). Were this to happen, the class members would risk receiving nothing. This strong legal defense weighs heavily in favor of finding that the settlement is fair and reasonable when compared to the $9.6 million figure representing the loss to the class.

### ii.     Likely Complexity, Length, and Expense of Litigation

In *Synfuel*, the Seventh Circuit instructed that the likely complexity, length, and expense of continued litigation are relevant factors district courts should consider in determining whether a class action settlement satisfies Rule 23. *Synfuel*, 463 F.3d at 653. All of these factors strongly weigh in favor of approval of the proposed settlement. Assuming affirmance of this court's March 7, 2008 order denying American Express' motion to compel arbitration, further litigation would be extremely costly and difficult in light of the fact that most, if not all, class members have disposed of their gift cards in the nine years since litigation started. Although much

discovery has taken place over the course of nine years, most of that discovery has been limited to identifying potential class members. The time and cost for additional discovery, potential experts, trial, post-trial motions, and appellate proceedings weigh in favor of granting final approval

### iii. Opposition

The Seventh Circuit has held that the amount of opposition to a settlement among affected parties is yet another factor district courts should consider in deciding whether to approve a class action settlement. *Synfuel*, 463 F.3d at 653. A low rate of opt-outs or objections reflects favorably on a settlement.[11] *See In re Mexico Money Transfer Litig.*, 164 F.Supp.2d 1002, 1020-21 (N.D. Ill. 2001).

According to the memorandum in support of final approval and attached affidavits, only 100 class members excluded themselves from the settlement, compared with over 81,460 persons who filed claims. The parties estimate the opt-out rate to be no more than .027% to .056% based on the estimation that the class is between 17.7 million and 36.9 million persons. [Dkts. 421, p. 5; 598, p. 29] However, there are two problems with the estimated opt-out rate. First, notice did not reach the entire class; it is estimated that notice reached approximately 70% of the settlement class. Therefore, logically, 30% of class members never had an opportunity to opt-out. Second, *Redman* counsels that computing the opt-out rate using the *total* class size is "naïve," especially when claims are filed by only "one-half of one percent" of the class, a number remarkably similar to the claims filed in the instant case (.2% to .4% of potential class members have filed a

---

[11] Of course, a low opt-out or objection rate could mean that class members simply did not think it worth their time and effort to make a claim for a small sum of money or to object to the settlement. "The magistrate judge's statement that 'the fact that the vast majority of class members—over 99.99%— have not objected to the proposed settlement or opted out suggests that the class generally approves of its terms and structure' is naïve …' The fact that the vast majority of the recipients of notice did not submit claims hardly shows acceptance of the proposed settlement: rather it shows oversight, indifference, rejection, or transaction costs." *Redman*, 768 F.3d at 629.

claims).[12]  *Redman*, 768 F.3d at 629.  Nevertheless, if the opt-out rate is computed using the number of exclusions versus the number of claims filed, the rate is still a relatively low .1%.  *In re Mexico Money Transfer Litig.*, 164 F.Supp.2d at1020-21 (acceptance rate of 99.9% of class members "is strong circumstantial evidence in favor of the settlements").

Similarly, there were only twenty objections.  [Dkt. 598, p. 29]  In general, the objections can be broken down into the following categories: (1) the notice programs were inadequate; (2) the settlement was not fair, reasonable or adequate; (3) the records contain insufficient information for class members to make an informed decision whether to file a claim, opt-out, or object; (4) the release is overly broad; (5) distinctions among the class members warrant sub-classing; (6) the requested attorneys' fees are unreasonably high; (7) the potential *cy pres* is improper.  [Dkt. 600, p. 6]  The final two objections (attorneys' fees and *cy pres*) will be addressed with class counsel's and Intervenors' petitions for attorneys' fees.

The court rejects the first category of objections addressing the notice programs.  After seven years, three rounds of notice, over $2 million in expenditures, and the use of an expert, the court does not see how the notice program could have been more effective without unreasonable additional expenditures.  While the program was far from perfect, perfection was not a realistic goal.  Similarly, the court rejects the third category of objections regarding insufficient information provided to class members.  Intervenors Goodman and Santsche were the only parties to make this objection.  In short, they wanted the notice to include their objections to the settlement.  Their position was disapproved of by Mr. Hilsee as it would likely violate neutrality and influence the class' decision to submit a claim, opt-out, or object and rejected by the court.

Further, the court has already decided that the settlement is fair, reasonable, and adequate, given the strong defenses available to American Express should this court reject final

---

[12] *See supra* note 11.

approval.[13]  With reference to the "overly broad" release, the Seventh Circuit has recognized that "[a] settlement offer is a compromise and may include release of claims not before the court." *Oswald v. McGarr*, 620 F.2d 1190, 1198 (7th Cir. 1980).  Additionally, a "federal court may release not only those claims alleged in the complaint, but also a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might have not been presentable in the class action." *Schulte v. Fifth Third Bank*, No. 09 C 6655, 2012 WL 254197, at *2 (N.D. Ill. June 15, 2012) (*quoting Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266, 273-74 (7th Cir. 1998).  Intervenors Goodman and Santsche want a narrower release to preserve their claims relating to the purchase of $100 gift cards that they allege turned out to have $0 balances when they first attempted to use them.  Granted, the breadth of the release is one of the problems with the settlement, but, on balance, the court does not believe the breadth of the release justifies rejecting the settlement.

Finally, the court is unpersuaded by the argument that distinctions within the class warrant sub-classing.  First, the claims process provides for the different types of claims (i.e., split-tender claims, monthly fee claims, check issuance fee claims, and attestation claims).  Second, the court rejected the Intervenors' argument that differences in state law require class members to be treated differently based on where they reside.  In fact, this court found that the common factual and legal issues of the class members predominate over individual questions particular to any putative class member that could be based on any perceived differences in state law.  [Dkt. 315]

### iv.    Experience and Views of Counsel

The settling parties argue at length that the settlement negotiations were conducted at arm's length and in good faith, which demonstrates that the settlement was not a product of

---

[13] *See supra* Analysis III.A.i.

collusion. [Dkt. 598, p. 29] As the settling parties acknowledge, the court, on a number of occasions, voiced its concern about the appearance of collusion based on what the settling parties characterize as a "recurring provision" of the settlement agreement that allowed American Express to pay notice and administration costs up front and then be reimbursed for those costs from the settlement fund once approved. However, the settling parties overlook another instance in which the court expressed concerned about possible collusion: class counsel's acceptance of American Express' assertion that it did not retain any customer information that would have allowed it to send out individual notice. Were it not for the Intervenors, the court and class counsel likely would never have discovered that American Express had access to at least some customer-identifying information.

Nevertheless, given the fact that the settlement in this case required seven years of work, a huge expenditure of effort by the court, four mediators, and a notice expert, this court concludes that the record supports that the final settlement agreement was made in good faith and in the absence of collusion. *Abrams v. Van Kampen Funds*, 2006 WL 163023, at *2 (N.D. Ill Jan. 18, 2006) (concluding that "the circumstances of the settlement support that there was no collusion between the parties" when the parties based the settlement amount on the recommendation of a neutral third party after two attempts to mediate and settle); *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F.Supp.2d 806 (E.D. Wis. 2009).

### v. Stage of Proceedings and the Amount of Discovery Completed

The final factor the court is to consider under *Synfuel* concerns the stage of the proceedings and the amount of discovery completed at the time of the settlement. *Synfuel*, 463 F.3d at 653. The parties have completed confirmatory discovery, including several depositions of American Express employees, and exchanged documents and data that allowed plaintiffs (and

Intervenors) to evaluate the strength of the class' claims. Although this settlement-directed discovery is not what the court needs "to evaluate the merits of plaintiffs' claims," *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 325 (7th Cir.1980), the court is not convinced that extensive formal discovery, when measured against the cost that would be incurred, would place the parties in a better position than they are now to determine an appropriate settlement value of this litigation. The parties have completed a sufficient amount of discovery to be able to place a value on their respective positions in this case. The final *Synfuel* factor weighs in favor of settlement.

## IV.    ATTORNEYS' FEES

"In a certified class action, the court may award reasonable attorney's fees ... that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). In determining a reasonable fee, the court "must balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund." *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir.1988), *cert. denied*, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989). To determine the reasonableness of the fees sought in a common-fund case, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir.2001) (*Synthroid I*). The probability of success at the outset of the litigation is relevant to this inquiry. *See Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir.1994).

In *Synthroid*, the Seventh Circuit held that the "market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case."

*Synthroid I*, 264 F.3d at 721. The Seventh Circuit has further explained that "[t]he object in awarding a reasonable attorney's fee ... is to give the lawyer what he would have gotten in the way of a fee in arm's length negotiation, had one been feasible." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir.1992). *See also In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir.2011) (recognizing that "[s]uch [an] estimation is inherently conjectural").

The Federal Rules of Civil Procedure allow the court, in a certified class action, to "award reasonable ... nontaxable costs that are authorized by law or by the parties' agreement." Fed.R.Civ.P. 23(h). The Seventh Circuit has instructed that district courts must exercise their discretion to "disallow particular expenses that are unreasonable whether because excessive in amount or because they should not have been incurred at all." *Zabkowicz v. W. Bend Co., Div. of Dart Indus., Inc.*, 789 F.2d 540, 553 (7th Cir.1986) (*quoting Henry v. Webermeier*, 738 F.2d 188, 192 (7th Cir.1984)).

### A. Lead Class Counsel and Additional Class Counsel

On August 13, 2015, lead and additional class counsel filed their petition for attorneys' fees. [584]  According to the motion and accompanying memorandum filed by lead and additional class counsel, lead class counsel have spent 2,766.6 hours over a roughly nine-year period litigating and settling this case on a contingent fee basis. [Dkt. 584-1, p.2]  They seek for their efforts an award of attorneys' fees equal to "30.7% of the value of the settlement to the class," or $1,235,000. [Dkt. 584, p. 4]  Lead class counsel also seeks $40,000 in costs and expenses. [Dkt. 584-1, p. 26]  In addition, additional class counsel seeks an award of attorneys' fees and costs equal to "6.2% of the value to the class," or $250,000. [Dkt. 584, p. 4]

There are a number of problems with how counsel calculates the "value" of the settlement fund to the class.  According to the petition for attorneys' fees, the total value of the

settlement to the class is approximately $4,000,000.  [Dkt. 585, p. 12]  Included in that

calculation are the following: (i) $600,000 to satisfy claims; (ii) $162,925 to refund persons

currently holding gift cards with a value under $25 (Balance Refund Program, paid outside of the

settlement fund); (iii) $81,437 in value waived in shipping/handling fees on new gift cards

(Purchase Fee Program, paid outside of the settlement fund); (iv) approximately $1,660,000

distributed via *cy pres*; and (v) $1,525,000 in attorneys' fees (lead class and additional class

counsel).  [Dkt. 585, p. 8]

      The law is clear that fees paid to lead and additional class counsel are not considered a

"value" to the class, as counsel should well know.  *Pearson v. NBTY, Inc.*, 772 F.3d 778, 781

(7th Cir. 2014) ("The attorneys' fees are of course not paid to the class members; and as we said

in *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014), 'administrative costs should

not have been included in calculating the division of the spoils between class counsel and class

members. Those costs are part of the settlement but not part of the value received from the

settlement by the members of the class. The costs therefore shed no light on the fairness of the

division of the settlement pie between class counsel and class members.'")  Additionally, this

circuit has held that a *cy pres* award does not constitute a benefit to the class for the obvious

reason that the recipient of the award is not a member of the class.  *Pearson*, 772 F.2d at 781.

The settling parties are incorrect in arguing that the *cy pres* was not a benefit to the class in

*Pearson* only because the beneficiaries could be identified.  The settling parties conflate two

distinct issues.  *Pearson* held that c*y pres* is not considered a benefit to the class *and* that the

$1.13 million *cy pres* award was not justified since the parties could be easily identified.  *Id.* at

784.

If the potential *cy pres* award and attorneys' fees are removed from the settlement value calculation, only $844,362 of value is being provided to the class, based on the settling parties' own calculation.[14] However, the settling parties have done a poor job advising the court of the total number of claims made.[15] For example, the settling parties state that $600,000 of the settlement fund will be used to satisfy claims. The amount of the settlement fund being used to satisfy claims actually totals $1,340,513. [Dkt. 598-2, p. 32] In addition, the Balance Refund Program is worth $324,450 to the class, not $162,925. [Dkt. 598-2, p. 32] Finally, the Purchase Fee Program provides a value to the class worth $202,801.50, not $81,437.[16] Therefore, the benefit to the class is $1,867,764.50.[17]

According to *Redman*, the ratio that is relevant to assessing the reasonableness of attorneys' fees is the ratio of (1) the fee to (2) the fee plus what the class members receive. *Redman*, 768 F.3d at 630. Including both the Balance Refund and Purchase Fee Programs,[18] the benefit received by the class is $1,867,764.50. That translates into a contingency fee of approximately 45% ($1,525,000 ÷ ($1,525,000 + $1,867,764.50)) instead of the claimed 36.9%. Unfortunately, there is not much authority, post-*Redman*, to guide the court as to what contingency fee percentage is reasonable. Typically, attorneys' fees of 25 – 33 1/3% of a settlement value are reasonable and typical. *Gaskill v. Gordon*, 160 F.3d 361, 362-63 (7th Cir. 1998) ("When a class suit produces a fund for the class, it is commonplace to award the lawyers

---

[14] $600,000 for claims; $162,925 for Balance Refund Program; $81,437 for Purchase Fee Program.

[15] The settling parties have failed to provide an accurate accounting of how the $6,753,269.50 settlement fund will be expended in terms of administration costs, claims that have been made to this point, and funds available for a *cy pres*. Instead the parties leave it to the court to do their work for them.

[16] Both the Balance Refund Program and Purchase Fee Program are paid outside of the settlement fund. Therefore, they arguably should not be included in calculating the "benefit" to the class.

[17] $1,340,513 for claims; $324,450 for Balance Refund Program; $202,801.50 for Purchase Fee Program. [Dkt. 598-2, p. 32]

[18] *See, supra*, note 16.

for the class a percentage of the fund…[M]ost suits for damages in this country are handled on the plaintiff's side on a contingent-fee basis. The typical contingent fee is between 33 and 40 percent; but in recognition of the fixed-cost component in litigation, it is usually smaller when as in this case a multimillion dollar judgment is obtained."); *Mexico Money Transfer Litig.*, 164 F.Sup.2d 1002, 1033 (N.D. Ill. 2008) (recognizing "the established 30% benchmark for an award of fees in class actions.") Clearly, the cases awarded fees based on the settlement fund as a whole and offer little guidance here. However, even accepting the settling parties' flawed method, 36.9% is a relatively high portion of the settlement fund. Of course, the more realistic figure of 45% is even higher.

To determine the reasonableness of the sought-after fee in a common-fund case, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Synthroid I*, 264 F.3d at 718. The Seventh Circuit has recognized, however, that such an estimation is inherently conjectural. *In re Trans Union Corp. Privacy Litig.*, 629 F.3d at 744. In *Synthroid I*, the Seventh Circuit held that the "market rate for legal fees depends in part on (1) the risk of nonpayment a firm agrees to bear, in part on (2) the quality of its performance, in part on (3) the amount of work necessary to resolve the litigation, and in part on (4) the stakes of the case. *Synthroid I*, 264 F.3d at 721.

As noted, the risk of nonpayment of attorneys' fees in this case is high. In the event that final approval is not granted, American Express will seek the enforcement of its mandatory arbitration clause. The amount of work expended in this case, over 3,200 hours between lead and additional class counsel over the course of seven years, has been substantial. [Dkt. 584] In fact, the attorneys' fees sought by lead and additional class counsel closely track their respective

lodestars.[19]  Further, the stakes in the case are high given that the class is large, the challenged activity is extensive, the complexity and costs of the legal proceedings are high, and a large amount of money is involved.  The performance of class counsel has been called into question by this court and by Intervenors on a number of occasions.  Nevertheless, the court credits class counsel with working diligently to resolve this matter, although for all the reasons described in this opinion, the performance of counsel was not unproblematic.

Nevertheless, decreasing the fees for lead and additional class counsel cannot benefit the class.  Because of the structure of the settlement fund, a second disbursement to the class members who have submitted a claim would be inherently unfair to those members who did not file a claim.  If the class members who did not file a claim were made aware that recovery could potentially be greater than the $40 cap explained in the notice, it is reasonable to think that they might have filed a claim.  Any decrease in the amount of attorneys' fees granted will therefore have to benefit American Express or benefit the *cy pres* recipient.

However, the court does not see fit to approve of lead and additional class counsel's petition for attorneys' fees.  Such a huge fee, in proportion to the amount being received by the class, would overly incentivize this kind of settlement, which offers a meager benefit to the class. Instead, the court finds it more appropriate to award lead class counsel a percentage closer to what is considered "reasonable" in this circuit (*i.e.*, between 20 and 33 1/3%).  The court therefore approves an award to lead class counsel in the amount of $1,000,000, 34.8% of the value of the benefit conferred on the class ($1,000,000 ÷ ($1,000,000 + $1,867,764.50)).  In

---

[19] Lead class counsel's lodestar is $1,299,341.55.  Additional class counsel's lodestar is $304,836.60 [Dkt. 584, n.1].  However, it is true that courts in this circuit have found that "[t]he use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive." *Will v. General Dynamics Corp.*, 2010 WL 4818174, at *3 (S.D.Ill. Nov. 22, 2010) (*citing In re Synthroid Mktg. Litig.*, 325 F.3d 974, 979–980 (7th Cir.2003) ("The client cares about the outcome alone" and class counsel's efficiency should not be used "to reduce class counsel's percentage of the fund that their work produced."); *In re Comdisco Sec. Litig.*, 150 F.Supp.2d 943, 948 n. 10 (N.D.Ill.2001) ("To view the matter through the lens of free market principles, [lodestar analysis] (with or without a multiplier) is truly unjustified as a matter of logical analysis.")).

addition, the court grants lead class counsel's petition for costs in the amount of $40,000. Additional class counsel's petition for $250,000 is granted, as it represents a small percentage of the total benefit conferred on the class.

### B. Counsel for Intervenors Goodman and Santsche

On August 12, 2015, counsel for Intervenors Goodman and Santsche filed a petition for an award of attorneys' fees and reimbursement of expenses based upon their contribution to enhancing the settlement fund. Although Intervenors filed a number of repetitive and meritless objections at various stages of this litigation, it is undeniable that were it not for the Intervenors, this settlement would likely never have been approved. And if the settlement was not approved, a reversal by the Seventh Circuit on the enforceability of the arbitration clause with a complete defeat to the class was possible.

The main contribution made by the Intervenors involved the supplemental notice programs. In relation to the first supplemental notice sent to the class, Intervenors were responsible for compelling American Express to admit that it retained at least some information pertaining to the identity of its customers. Intervenors were also responsible for pointing out the ineffectiveness of the notice program in actually reaching the class members. Because of the Intervenors' objections, the court hired expert Todd Hilsee to review the notice program and ultimately to design and oversee enhancements. The second supplemental notice was the result of Intervenors' objection regarding notice of attorneys' fees to the potential class prior to the objection deadline. The objection made by Intervenors was prescient given the ruling in *Redman* only a few months later. The supplemental notice programs increased the claims rate from almost nothing to over $1.3 million.

The law generally does not allow good Samaritans to claim a legally enforceable reward for their deeds. *Nadalin v. Automobile Recovery Bureau, Inc.*, 169 F.3d 1084, 1086 (7th Cir.1999); Saul Levmore, "Explaining Restitution," 71 Va. L.Rev. 65 (1985). But when professionals render valuable albeit not bargained-for services in circumstances in which high transaction costs prevent negotiation and voluntary agreement, the law allows them to claim a reasonable professional fee from the recipient of their services. *Gaskill*, 160 F.3d at 363; *In re In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 568, 571; Levmore, *supra*, at 66. That is the situation of objectors to a class action settlement. Their participation is encouraged by permitting those who contribute materially to the proceeding to obtain a fee. *Gottlieb v. Barry*, 43 F.3d 474, 490–91 (10th Cir.1994); *Fisher v. Procter & Gamble Mfg. Co.*, 613 F.2d 527, 547 (5th Cir.1980); *White v. Auerbach*, 500 F.2d 822, 828 (2d Cir.1974).

The principles of restitution that authorize such a result also require, however, that the objectors produce an improvement in the settlement worth more than the fee they are seeking; otherwise they have rendered no benefit to the class. *Reynolds*, 288 F.3d at 288, *citing Class Plaintiffs v. Jaffe & Schlesinger, P.A.*, 19 F.3d 1306, 1308 (9th Cir.1994) (*per curiam*); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1156 (8th Cir.1999). In this case, it is difficult to determine, exactly, the value of the improvement to the settlement provided by the Intervenors. Although the second and third rounds of notice might not have occurred absent the objections from Intervenors, it would be disingenuous to attribute the additional $1,329,136[20] in claims entirely to their efforts. It is also not clear to what extent, if any, the two programs outside of the settlement fund, the Balance Refund and Purchase Fee Programs, are attributable to the Intervenors. Nevertheless, the court has no doubt that counsel for Intervenors materially

---

[20] Only $11,377 worth of claims were made as a result of the first round of notice. [598-2, p. 32]

benefitted the class. It accordingly awards counsel for Intervenors Goodman and Santsche $700,000 based on their efforts in improving the settlement fund for the class. $700,000 reflects approximately 34% of the value added to the class, using the formula set forth in *Redman*.[21]

The remaining issue is the ratio of total attorneys' fees to the benefit received by the class. The fees granted to lead and additional class counsel and counsel for Intervenors total $1,950,000, slightly more than the value received by the class, $1,867,764.50. However, as noted, reducing the fees for the attorneys will not directly benefit the class. Reduction of fees will either benefit American Express or the *cy pres* recipient. In light of the factors described above, the court believes the attorney awards, as outlined above, is the best solution.

## C. *Cy Pres* and American Express' First Round of Notice

Because the court does not have an accurate accounting of the administrative costs incurred thus far in the settlement, it is ill equipped to determine how much of the settlement fund will be distributed via *cy pres*.[22] However, whatever the amount, the court approves Consumer Reports/Consumers Union as an appropriate recipient.[23] In addition, the court sees no reason to disturb its ruling of December 18, 2014 that American Express should not be reimbursed for the first round of notice. [Dkt. 537] Accordingly, paragraph 3.3(a) of the Settlement Agreement must be edited to allow reimbursement to American Express only for the costs incurred in the second and third rounds of notice. As noted, the first round of notice was inadequate. Few class members were notified, few claims were received, and American Express

---

[21] ($700,000 ÷ ($700,000 + $1,329,136)) = 34.5%

[22] The best figure the court possesses for the cost of rounds 2 and 3 of notice is simply an estimate from the administrator on April 22, 2015. [Dkt. 556-1] According to estimates, round 3 of notice cost approximately $1.8 million. As a result, approximately $300,000 will remain for *cy pres* (Attorneys' fees: $1.95M; Class claims: $1.3M; Notice costs: $3.1M)

[23] The Intervenors suggested, and the settling parties did not object to, Consumer Reports/Consumers Union as a *cy pres* recipient during the final fairness hearing on January 22, 2016 [Dkt. 613]

had not yet disclosed all of the customer-identifying information in its possession.  Because the initial notice campaign resulted in such a paltry number of claims filed, it cannot be considered to have advanced the settlement in any meaningful way.

## V.    CONCLUSION

For the reasons set forth above, plaintiffs' motion for final approval of class action settlement [356] is granted.  Lead and additional class counsel's motion for approval of attorneys' fees [584] is granted in part and denied in part.  The court awards attorneys' fees to lead class counsel in the total amount of $1,000,000, plus $40,000 in expenses.  The court also awards attorneys' fees to additional class counsel in the total amount of $250,000.  Petition for fees by counsel for Intervenors Goodman and Santsche [583] is granted in part and denied in part.  The court awards attorneys' fees to counsel for Intervenors Goodman and Santsche in the total amount of $700,000.  The court reiterates its approval of incentive awards to the representative parties in the amount of $1,000 for each party.  The court approves Consumer Reports/Consumer Union as the *cy pres* recipient, and the court denies American Express' renewed request for reimbursement for the cost of the first round of notice in the amount of $527,580.27.

Date:  March 2, 2016                                    _____/s/_____

                                                                Joan B. Gottschall
                                                                United States District Judge