𝕴𝖓 𝖙𝖍𝖊

# United States Court of Appeals

## For the Seventh Circuit



CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

———————————

No. 16-1691

SAUL M. KAUFMAN, individually and on behalf of all others similarly situated, et al.,

*Plaintiffs-Appellees*,

and

J.G. GOODMAN, also known as J.L. Goodman, Objector, et al.,

*Intervening Plaintiffs-Appellants*,

*v.*

AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:07-cv-01707 — **Joan B. Gottschall**, *Judge*.

———————————

ARGUED SEPTEMBER 28, 2017 — DECIDED DECEMBER 7, 2017

———————————

Before BAUER, MANION, and HAMILTON, *Circuit Judges*.

MANION, *Circuit Judge*. Saul Kaufman, as lead plaintiff in a class action, sued American Express Travel Related Services

Company, Inc. ("Amex"), alleging claims for breach of contract, unjust enrichment, and statutory fraud related to Amex's general-use, prepaid gift cards. Just over two years after Kaufman filed the class action, Kaufman (on behalf of the class) and Amex sought approval from the district court of a settlement agreement that would resolve the action. Almost seven years later, after multiple amended motions for approval and three rounds of notice to the class, the district court granted final approval of the settlement. J.G. Goodman and Carla Santsche ("Intervenors"), who had intervened in the class action, appeal the approval of the settlement. While we recognize this settlement is not without issues, we conclude the district court did not abuse its discretion in approving it.

## I. Background

The protracted history of this case began on February 14, 2007, when Kaufman filed a class-action lawsuit in the Superior Court of Cook County, Illinois, against Amex. The claims arose out of Amex's sale of general-use, prepaid gift cards. A customer could buy a gift card by paying the amount to be loaded on the card (e.g., $25, $50, or $100) and a purchase fee of less than $5. The packaging in which the gift cards came declared they were "good all over the place."

Kaufman alleges, however, that these gift cards were not worth their stated value (e.g., a $25 card was not actually worth $25) and that they were not "good all over the place." This is because merchants were ill-equipped to process "split-tender" transactions, which occurred when a gift-card holder attempted to use his gift card to purchase an item that cost more than the value remaining on his card, necessitating the use of two forms of tender. The inability to process those sorts

of transactions led to rejected cards and languishing balances, as gift-card holders could not use the relatively small amounts remaining on their cards.

Those balances did not have to languish for long, though, because after twelve months Amex automatically began charging a $2 "monthly service fee" against balances on the cards. If a holder wanted to recover the balance of his card from Amex, he could request a check, but only if he paid a $10 check-issuance fee. Because of these service and check-issuance fees, which resulted in remaining funds on the cards going to Amex, Kaufman alleged Amex had purposely designed its gift-card program to make it difficult for people to exhaust the balances on their cards, thus lowering their value.

On March 27, 2007, Amex removed the class action to the District Court for the Northern District of Illinois pursuant to the Class Action Fairness Act. 28 U.S.C. § 1332(d)(2). Once in federal court, Amex moved to compel arbitration, citing the arbitration provision in the "American Express Gift Card Cardholder Agreement" that was included with the gift cards. For cards purchased from stores, this agreement was only accessible after purchasing the gift card and opening its packaging.

The district court denied the motion, concluding the provision was not part of the contract between Amex and Kaufman. Amex appealed that decision to this court. Shortly thereafter, Amex and Kaufman engaged in settlement negotiations through this court's Mediation Program. As a result of those negotiations, the parties sought a limited remand of Amex's appeal for the purpose of presenting their settlement to the district court for approval. On February 4, 2009, we granted that request.

After remand, the Intervenors sought entry into the action.[1] Intervenor Goodman was the lead plaintiff in a class action in the Eastern District of New York that made similar complaints against Amex arising from issues with split-tender transactions and Amex's fee policies. In the briefs filed in this appeal, the Intervenors explain that intervenor Santsche's interest in this case arises from her alleged purchase of a $100 gift card that had no value when she attempted to use it. On July 15, 2009, the district court granted the motion to intervene.

Two days before the grant of that motion, Kaufman, joined by a new co-plaintiff, Kimberly Stegich, individually and on behalf of all others similarly situated ("Plaintiffs"), filed an amended class-action complaint and a motion for preliminary approval of a settlement of the action. But before the district court addressed that motion, the Plaintiffs amended it. According to the amended motion, the settlement called for a $3,000,000 fund. From that fund, class members could receive, in exchange for their release of all claims related to Amex's gift cards, the following payments: (1) up to $20 in reimbursement for monthly fees actually paid due to refused split-tender transactions; (2) up to $8 for monthly fees paid; (3) up to $5 in reimbursement of any check-issuance fee paid; and (4) up to $5 in reimbursement for monthly fees paid simply by

---

[1] Four other parties also intervened in the action: Gordon Jarratt and Amanda Rudd, who eventually became co-plaintiffs and whose counsel became additional class counsel, and Kambiz and Katayoun Kazemi, who eventually reached a separate settlement of their California class action against Amex and were excluded from the class in this case.

attesting to the fact that the fees were paid.[2] If any of the $3,000,000 remained after paying claims, up to $200,000 would go to a charitable organization as *cy pres*. If more than that remained, up to $650,000 would go to Amex as reimbursement for the costs of notice and administration. If still more remained, that too would go to the *cy pres*.

In addition to payments from the fund, class members could also take part in two supplemental programs: (1) the "Balance Refund Program," which allowed class members with less than $25 remaining on their gift cards to request a refund of their balance without paying the check-issuance fee; and (2) the "Purchase Fee and Shipping/Handling Fee Waiver" program, through which class members could purchase a new $100 Amex gift card without paying the purchase fee or shipping and handling fee (a savings of approximately $10).

The district court entered its order on the Plaintiffs' motion on December 22, 2009. After concluding that the class was certifiable pursuant to Federal Rule of Civil Procedure 23, the court certified the class for settlement purposes, defining the class as

> All purchasers, recipients, holders and users of any and all gift cards issued by American Express from January 1, 2002 through the date of preliminary approval of the settlement, including, without limitation, gift cards sold at physical retail locations, via the Internet, or through mall cobranded programs. Notwithstanding the

---

[2] To recover the other benefits, a class member had to provide proof, including a gift-card number.

foregoing, 'Be My Guest' dining cards are not included within the settlement.

*Kaufman v. Am. Express Travel Related Servs. Co.*, 264 F.R.D. 438, 444 (N.D. Ill. 2009).

Despite certifying the class, the court denied preliminary approval of the settlement. Of particular concern to the court was the inadequacy of the proposed notice, both in form (the Plaintiffs had proposed notice by publication, but the court did not accept the proposition that Amex had no personal-identifying data with which to provide individualized notice) and substance (the notice failed "to satisfy the requirements of Rule 23(c)(2)(B)"). *Id.* at 445–46.

The district court addressed the proposed settlement again in an order on August 19, 2010. The court observed that the parties had improved the proposed notice, but now it was too complicated—the court ordered that it should include a concise summary. Additionally, the court noted that, since the initial denial of preliminary approval, Amex had revealed that it *did* have some personal-identifying information for gift-card holders, so the court declined to excuse individual notice.

Over a year later, the Plaintiffs filed their Second Amended Motion for Preliminary Approval. The settlement now proposed a fund of $6,753,269.50. While this fund was considerably larger than the $3,000,000 initially proposed, it would be drawn against for the costs of notice and administration, as well as approved attorneys' fees and lead-plaintiff incentive awards. The benefits available to the class (the four types of refunds and the supplemental programs) and the release remained substantially the same. This version of

the settlement maintained the *cy pres* but removed the $650,000 reimbursement for Amex. It also called for notice by publication and by direct mail to every class member for which Amex had information.

On September 21, 2011, the district court granted preliminary approval of the settlement, appointed the Plaintiffs' counsel as lead class counsel and counsel for two intervening parties as additional class counsel, and again certified the class for purposes of the settlement.[3]

After providing notice and receiving responses from class members, the Plaintiffs and Amex sought final approval of the settlement on February 16, 2012. However, response to the notice had been "abysmal." Of the approximately 70,000,000 gift cards sold, only 3,456 benefits had been requested, amounting to $41,510.35.[4] As class counsel was requesting $1,525,000 in fees, the fee-to-claims ratio was woefully imbalanced. The district court decided that issues with notice needed to be addressed, and so determined to hire a notice expert. After the Intervenors objected to the appointment of the court's recommended expert due to her affiliation with the firm serving as the settlement administrator, the district court appointed Todd Hilsee, whom the Intervenors had recommended.

---

[3] The class definition was amended to exclude "Westfield" branded gift cards due to the Kazemi intervenors pursuing their own relief in California. See *supra*, note 1.

[4] This is the number given by the district court in its order denying final approval. Later in the litigation, the district court was provided with information suggesting that the actual claims rate was much lower even than that—amounting to a paltry $11,377.

The parties worked with Hilsee to create a supplemental notice program, and after its implementation the Plaintiffs once again moved for final approval of the settlement on May 28, 2014. The supplemental notice plan had provided notice to approximately 70% of the class, and over 32,500 claims were filed. While these numbers were not ideal, they represented an astronomical improvement over the results of the first round of notice. There were only five objections, and eighty class members chose to opt out.

Despite this solid improvement in the response to the notice, the district court again denied final approval. The court did so for two reasons: (1) though no longer as blatant as the first proposal, the settlement still provided for Amex to be reimbursed for the costs of providing the first, unsuccessful notice; and (2) the court felt bound by our decision in *Redman v. RadioShack Corp.*, 768 F.3d 622, 637–38 (7th Cir. 2014), which was decided after the Plaintiffs filed their motion for final approval but before the district court issued its order, to command yet another round of notice concerning motions for attorneys' fees.

After this third round of notice, the district court granted final approval of the settlement on March 2, 2016. The greater part of a decade had elapsed since Kaufman filed his complaint in the Superior Court of Cook County, Illinois, and nearly seven years had passed since the first motion for preliminary approval of the settlement. The district court determined that the settlement was fair, reasonable, and adequate, but referred to final approval as the "least bad option." *Kaufman v. Am. Express Travel Related Servs. Co.*, No. 07-cv-1707, 2016 WL 806546, at *1 (N.D. Ill. Mar. 2, 2016). Based on the affidavit of an Amex employee, the court concluded the total

value of the claims at issue was approximately $9.6 million. It then calculated that, considering the total number of claims received and the value of the supplemental programs (the waived purchase, shipping and handling, and check-issuance fees), the total benefit to the class from the settlement was $1.8 million. The court determined that this was within the range of a reasonable settlement given the class's likelihood of not recovering the full $9.6 million. In reaching that decision, the district court considered Amex's defenses, most notably its still-pending appeal of the denial of its motion to compel arbitration.

The district court also remarked that if the case continued, it would be extremely costly and difficult, and that there was, even considering the fact that notice was not perfect, a small rate of opt-outs and objectors. After addressing the objections that had been filed, the court observed that this settlement was seven years in the making and had involved the participation of four mediators and a notice expert. In light of all of those considerations, the court found that the parties had negotiated the settlement in good faith, and it approved the settlement.

Having approved the settlement, the court turned to attorneys' fees. The Plaintiffs' counsel had requested $1,235,000 in fees and another $40,000 in expenses, which they claimed amounted to 30.7% of the settlement. Additional class counsel requested $250,000 in fees. Counsel for the Intervenors requested $1,500,000 in fees. The district court ultimately awarded $1,000,000 in fees and $40,000 in expenses to the Plaintiffs' counsel, $250,000 in fees to additional class counsel, and $700,000 in fees to counsel for the Intervenors.

In the final tally, attorneys would be receiving $1,950,000 from the settlement, while class members would receive approximately $1,800,000. The district court did not like this, but found it acceptable as any reduction in fees would not go to the benefit of the class. Any excess would go either to the *cy pres* or to Amex.

The Intervenors appeal the approval of the settlement and the awards of attorneys' fees.

## II. Analysis

A district court may approve a settlement of a class action if it concludes that it "is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); see also *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996). We review a district court's approval of a class-action settlement only for abuse of discretion. *In re Southwest Airlines Voucher Litig.*, 799 F.3d 701, 711 (7th Cir. 2015). That said, we "require[] district judges to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions," due to the risk that attorneys for the class will "place their pecuniary self-interest ahead of that of the class." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002). Indeed, we have repeatedly stated that district courts should act as the "fiduciary of the class," subject "to the high duty of care that the law requires of fiduciaries." *Id.* at 279–80; *accord Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652–53 (7th Cir. 2006).

On appeal, the Intervenors challenge four decisions of the district court: (A) the district court erred by not requiring the filing of briefs in support of the settlement prior to the deadline to object to the settlement; (B) the district court erred in determining that Amex's arbitration appeal posed a risk to

the class's success; (C) the district court erred in approving the settlement given the breadth of the release; and (D) the district court erred in not awarding most, if not all, of the attorneys' fees to the Intervenors' counsel. We address each in turn.

## A. The Filing of Briefs

The Intervenors acknowledge that there is no express requirement in the Federal Rules or in the case law requiring the proponents of a class-action settlement to file their briefs in support of the settlement prior to the expiration of the time to object to the settlement. However, they argue that this procedure is compelled as a matter of due process and that it is a natural extension of our decision in *Redman* and the Ninth Circuit's decision in *In re Mercury Interactive Corp. Securities Litigation*, 618 F.3d 988 (9th Cir. 2010), upon which *Redman* relied. We disagree.

In *Mercury Interactive Corp.*, the Ninth Circuit held that a district court must "set the deadline for objections to counsel's fee request on a date *after* the motion and documents supporting it have been filed." *Id.* at 993. The court so held based on "[t]he plain text of [Rule 23(h)]," which provides that requests for attorneys' fees must be made by motion and that class members "may object to the motion." *Id.* (quoting Fed. R. Civ. P. 23(h)). This language implied that class members must "be allowed an opportunity to object to the fee 'motion' itself, not merely to the preliminary notice that such a motion will be filed." *Id.* at 993–94. Without the details provided by a motion (such as the amount of hours worked and the tasks completed), a potential objector "could make only generalized arguments about the size of the total fee." See *id.* at 994.

In *Redman*, we adopted the Ninth Circuit's reasoning and reversed the approval of a class-action settlement in part because the district court had provided for the filing of motions seeking attorneys' fees after the deadline for class members to object to the settlement. See 768 F.3d at 637–38. We concluded that the scheduling violated Rule 23(h) by handicapping those who wished to object to the fee motions. *Id.*

The Intervenors urge us to extend *Redman*'s reach to apply to the filing of briefs in support of settlement before the deadline to object. But, as the Ninth Circuit made clear, the plain text of Rule 23(h), which deals exclusively with attorneys' fees and costs, is what requires parties to file motions for attorneys' fees before the deadline to object to the settlement. There is no such requirement for the filing of briefs in support of a settlement agreement. On the contrary, Rule 23(e), which governs the approval of class-action settlements, only requires that notice of the proposed settlement be directed "in a reasonable manner to all class members who would be bound by the proposal," and that "[a]ny class member may object to the proposal if it requires court approval under this subdivision (e)." Fed. R. Civ. P. 23(e)(1), (5). Rule 23(e) thus only requires that class members be given an opportunity to object to the proposed settlement—the Rule has no provision that would require parties to file briefs in support of the settlement prior to the deadline to file objections.

The differing procedures make sense. In the fee-request context, the general notice may give parties information concerning the total amount of fees requested, but no details. To require a party to object based on an aggregate number alone would be fruitless, as there would be no specifics to dispute. See *In re Mercury Interactive Corp.*, 618 F.3d at 994 (requiring

the filing of fee motions before the deadline for objections because "[i]t ensures that the district court, acting as a fiduciary for the class, is presented with adequate, and adequately-tested, information to evaluate the reasonableness of a proposed fee"). On the other hand, the notice of a proposed settlement should provide class members with all the information they need to make an informed decision to file a claim, opt out, or object. See generally *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) ("[A] fully descriptive notice … sent first-class mail to each class member, with an explanation of the right to 'opt out,' satisfies due process."). There is no need for the briefs of the parties in favor of settlement to be filed first. In addition, we have repeatedly told district courts to consider the amount of opposition to a proposed settlement in deciding whether to approve it. E.g., *Synfuel Techs., Inc.*, 463 F.3d at 653; *Isby*, 75 F.3d at 1199. Briefs in support of a proposed settlement thus routinely address the subject, which they could not do if the deadline for objections had not already passed. Accordingly, we conclude that our holding in *Redman* does not compel the procedure the Intervenors propose, and the district court did not err in declining to employ that procedure.

### B. The Arbitration Defense

Though we have elucidated several factors to guide a district court's analysis of whether a proposed settlement is fair, reasonable, and adequate, we have repeatedly stated that "[t]he 'most important factor relevant to the fairness of a class action settlement' is … 'the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.'" *Synfuel Techs., Inc.*, 463 F.3d at 653 (quoting *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th

Cir. 1979)); accord *Isby*, 75 F.3d at 1199. In analyzing this factor, the district court should consider "the range of possible outcomes and ascrib[e] a probability to each point on the range." *Synfuel Techs., Inc.*, 463 F.3d at 653 (alteration in original) (quoting *Reynolds*, 288 F.3d at 285). This requires acknowledgment of potential defenses and the risk of failure for the class. See *Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629, 634 (7th Cir. 2011). However, we have instructed the district courts "to refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights." *Isby*, 75 F.3d at 1196–97 (quoting *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985)). We have also taught that the *Synfuel/Reynolds* evaluation of potential outcomes need not always be quantified, particularly where there are other reliable indications that the settlement reasonably reflects the relative merits of the case. See *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864 (7th Cir. 2014).

The Intervenors argue that the district court improperly analyzed this factor by giving too much weight to Amex's potential arbitration defense. The district court concluded there was a significant risk that this court would reverse the district court's decision and send the action to arbitration, where the Plaintiffs would likely receive nothing. Because of that risk, the district court concluded that the approximately $1.8 million the class would receive from the settlement was a reasonable recovery. To support that conclusion, the district court cited two recent decisions of the Supreme Court and a recent decision of this court enforcing arbitration provisions in contracts: *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304, 2307, 2312 (2013), which required enforcement of an arbitration provision despite the fact that "the plaintiff's cost

of individually arbitrating a federal statutory claim exceeds the potential recovery," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336, 348 (2011), which held that a state rule "conditioning the enforceability of certain arbitration agreements on the availability of classwide arbitration procedures" was preempted by the Federal Arbitration Act, and *Gore v. Alltell Communications, LLC*, 666 F.3d 1027, 1030 (7th Cir. 2012), which determined that the arbitration provision in one contract between the parties compelled arbitration of a claim arising under a different contract between the parties.

The Intervenors maintain that these cases are inapposite to the consideration of the effect of Amex's arbitration defense in this case. They point out that the cited cases all deal with the enforceability of arbitration provisions contained in contracts between the parties, and that, they claim, is not the situation here. Here, the district court denied Amex's motion to compel arbitration not because it concluded that the provision was unconscionable or otherwise unenforceable, but because it determined that the provision was not a part of the contract between Amex and Kaufman.

It did so in reliance on our decisions in *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996), and *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147 (7th Cir. 1997). In those cases, we concluded that contract terms contained on the inside of a product's packaging (and thus only discoverable after purchase) become part of the contract between the purchaser and the seller so long as the purchaser had "an opportunity to read the terms and to reject them by returning the product." *Gateway 2000, Inc.*, 105 F.3d at 1148. The district court applied this rule to the Cardholder Agreement and concluded that there was

not a sufficient opportunity to reject the terms of the agreement by returning the card, so the terms contained inside the packaging were not terms of the contract between Kaufman and Amex. *Kaufman v. Am. Express Travel Related Servs. Co.*, No. 07-C-1707, 2008 WL 687224, at *8 (N.D. Ill. Mar. 7, 2008). Having resolved the motion in that way, the district court did not reach the question of enforceability. *Id.*; see also *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 583 (1960) ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."). Because the district court did not address the contract-formation issue in its order approving the settlement, the Intervenors believe the court abused its discretion.

The court's reasoning in its order on final approval of the settlement certainly puts the enforceability cart before the contractual horse. Still, we do not believe that the district court abused its discretion in concluding that the pending appeal concerning the arbitration provision is a significant potential bar to the class's success in this action.

To begin with, our review of the district court's decision to deny arbitration would be de novo. *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033 (7th Cir. 2016) (noting de novo review of contract-formation and arbitration-enforceability questions). Thus, the inquiry into whether the terms included in the gift-card packaging became part of the contract between the parties would be a question for this court to decide without deference to the district court's conclusions. That adds to the uncertainty surrounding the outcome, and increases the risk to the class. See *Williams*, 658 F.3d at 634–35 ("The prospect of appellate review affects the risk and costs (in time and money) of the litigation.").

And if we were to conclude that the arbitration provision was part of the contract between the parties, then there is little doubt we would enforce it. The parties do not dispute that the claims at issue in this case fall within the scope of the provision, and the law clearly favors enforcement of arbitration provisions in contracts, as the district court noted. See, e.g., *AT&T Mobility LLC*, 563 U.S. at 339. In light of those considerations, the district court's conclusion was not an abuse of discretion.

### C. Overbreadth

The settlement class is defined to include, with only a few exceptions, all those who held Amex gift cards from January 2002 through September 21, 2011. Per the terms of the settlement, the members of the class are releasing "any and all rights, duties, obligations, claims, actions, causes of action or liabilities … that relate to any and all Gift Cards issued by American Express (or any affiliate thereof) from January 1, 2002 through [September 21, 2011]."

The Intervenors believe this release is overbroad. They contend it releases claims that are not receiving compensation from the settlement. Specifically, the Intervenors highlight the alleged claim of intervenor Santsche, who alleges she purchased a $100 gift card by paying the purchase fee, but then the gift card was literally unusable because it had no value. The Intervenors maintain that Santsche's case is one of many, constituting "hundreds of millions of dollars of unjustified 'up-front' fees." As the settlement only proposes compensation for the payment of the $2 per month maintenance fees and the check-issuance fees, the Intervenors say that class members with claims like Santsche's are giving up their claims while receiving nothing in return.

The district court acknowledged that the release would cover the Intervenors' alleged $0-balance claims and that "the breadth of the release is one of the problems with the settlement." *Kaufman*, 2016 WL 806546, at *9. "[B]ut," the court concluded, "on balance, the court does not believe the breadth of the release justifies rejecting the settlement." *Id.*

"A settlement offer is a compromise and may include a release of claims not before the court." *Oswald v. McGarr*, 620 F.2d 1190, 1198 (7th Cir. 1980). Nevertheless, because of the unique situation posed by a class action—whereby attorneys for the class may be incentivized to accept inadequate settlement terms so long as they receive their fees—it is necessary for a court to scrutinize what claims the class is giving up and what the class is receiving in exchange. See *Reynolds*, 288 F.3d at 283–84.

Here, the district court's conclusion was not an abuse of discretion because there was no admissible evidence that the purported claims existed. The total size of the class in this case is not known, but the district court referred to an estimated range of 17.7 to 36.9 million people. Thanks to the district court's decision to appoint a notice expert, notice was provided to this massive class in a reasonable and effective manner, reaching approximately 70% of the members. Assuming the veracity of the Intervenors' allegations, it is probable that at least some of the persons with $0-balance claims received notice. However, no party submitted any admissible evidence of those claims—not even an affidavit or declaration from Santsche herself. Granted, it is not an objector's duty to show that the settlement is inadequate. See *Gautreaux v. Pierce*, 690 F.2d 616, 630 (7th Cir. 1982). But the burden on the proponents to support the settlement should not extend to an affirmative

duty to rebut every allegation an objector makes. See *id.* at 631. In the absence of any admissible evidence that the purported claims even exist, the district court's conclusion that the release of these claims was not a sufficient reason to deny approval of the settlement was not an abuse of discretion.

### D. Attorneys' Fees

In reviewing the award of attorneys' fees, "'[w]e review the district court's methodology de novo to determine whether it reflects procedure approved for calculating awards,' and we review the reasonableness of the award for abuse of discretion." *Williams*, 658 F.3d at 635–36 (quoting *Sutton v. Bernard*, 504 F.3d 688, 691 (7th Cir. 2007)).

The district court awarded the Plaintiffs' counsel $1,000,000 in fees, additional class counsel $250,000 in fees, and the Intervenors' counsel $700,000 in fees. The Intervenors do not challenge the methodology used to determine these fee awards, instead focusing on the amounts of the awards themselves. The Intervenors (or, perhaps more accurately, their counsel) maintain the district court erred in failing to award them most, if not all, of the attorneys' fees in this case.[5] They

---

[5] In many ways, this argument is emblematic of what is wrong with class actions. The Intervenors spend a vast majority of their 49-page brief to this court attacking the settlement as unfair, unreasonable, and inadequate. They claim it releases hundreds of millions of dollars' worth of claims without receiving anything for those claims. Yet, when it comes time to divvy up the money, their counsel is right there with open hands, claiming not only that they helped make the settlement better than it could have been, but that they are *solely* responsible for the settlement's success. We do not mention this *chutzpah*, as similar conduct has been called in the past, see *Mirfasihi v. Fleet Mortg. Corp.*, 551 F.3d 682, 687 (7th Cir. 2008), to criticize counsel for the Intervenors—they are just looking out for their

argue that while they were working to further the interests of the class, the Plaintiffs' counsel were colluding with Amex.

"The law generally does not allow good Samaritans to claim a legally enforceable reward for their deeds." *Reynolds*, 288 F.3d at 288. But, if a professional "render[s] valuable albeit not bargained-for services in circumstances in which high transaction costs prevent negotiation and voluntary agreement, the law does allow them to claim a reasonable professional fee from the recipient of their services." *Id.* In order to claim that fee, the value provided by the professional must "be worth more than the fee [he is] seeking." *Id.*

Here, the district court acknowledged that the Intervenors were important to getting Amex to divulge its information on class members, that they suggested the notice expert the court ultimately appointed, and that they anticipated the attorneys'-fee-notice requirement we announced in *Redman* in their objections. Indeed, the court went so far as to say that it is "undeniable" that the settlement would never have been approved without the Intervenors.

The Intervenors take these acknowledgments and run with them, claiming responsibility for all the good in the case. However, the Intervenors ignore that the district court also observed that they filed "a number of repetitive and meritless objections." Additionally, the court considered it "disingenuous" to attribute the increase in claims due to the second notice program (crafted with the assistance of the notice expert and using the information obtained from Amex) entirely to them. Finally, it noted that it was unclear to what extent the

---

interests. We merely remark that it is unfortunate that this is the way the game is played.

Intervenors could claim responsibility for the supplemental programs. Considering the full impact the Intervenors had on the case, the district court awarded counsel for the Intervenors $700,000 in fees, representing what the court calculated to be approximately 34% of the value they added to the class.

We conclude there was no abuse of discretion in awarding the attorneys' fees. Having dealt with the parties and their counsel for nearly seven years, the district court was easily in the best position to determine which parties (and which attorneys) had contributed to the settlement and in what proportions. See *Williams*, 658 F.3d at 637 (seeing "no reason to disturb the district court's assessment of fees" where the judge "became intimately familiar with [the] litigation over the past eight years"); see also *Mirfasihi v. Fleet Mortg. Corp.*, 551 F.3d 682, 687–88 (7th Cir. 2008) (affirming the district court's 50% reduction to the objectors' fee based on their "irresponsible litigation tactics").

### III. Conclusion

The decision we affirm today did not approve a perfect settlement. The individual class members (those who bothered to submit claims) will receive very little, while attorneys will receive more than all of the class members combined. But even the attorneys have not come out as well as they had hoped.

The district court, throughout this case, properly exercised its responsibility to look out for the class by consistently denying inadequate proposals and working with the parties to overcome the challenges associated with notice to get this settlement into an approvable posture. In the end, the court found itself in an unenviable position: it could either approve

the adequate—albeit flawed—settlement and allow the class members to get their meager recoveries, or reject it and have the parties further exhaust their resources (and the settlement fund) on notice or discovery or have them turn to litigation where the class ran the risk of recovering nothing. It chose the former course, and that was not an abuse of discretion. We AFFIRM.